PARTIDO INDEPENDENTISTA PUERTORRIQUEÑO, representado por su Presidente RUBÉN BERRÍOS MARTÍNEZ, demandante y apelado, *v.* ESTADO LIBRE ASOCIADO DE PUERTO RICO, GERINELDO BARRETO PÉREZ, ETC., demandados y apelantes; NEW DEMOCRATIC PARTY OF PUERTO RICO, interventor y apelante; LUIS A. FERRÉ, HERNÁN PADILLA, ORESTE RAMOS, HIJO y EDWIN RAMOS YORDÁN, como funcionarios del Partido Republicano Local, interventores y apelantes.

*Número:* O-80-68    *Resuelto:* 25 de abril de 1980

Luis A. Rivera Lacourt, abogado del Partido Independentista Puertorriqueño, apelado; Miguel A. Pagán, Eunice Sein Llompart y José A. Carlo, abogados del Administrador General de Elecciones, apelante; Héctor M. Laffitte y Héctor Reichard, Jr., abogados del New Democratic Party of Puerto Rico, interventor y apelante.

### RESOLUCIÓN

San Juan, Puerto Rico, a 7 de marzo de 1980

A la anterior moción de reconsideración, no ha lugar. Todos los Jueces reiteran sus respectivas posiciones.

Lo acordó el Tribunal y certifica el Secretario.

(Fdo.) Ernesto L. Chiesa
*Secretario*

### EN MOCIÓN DE RECONSIDERACIÓN

Voto del Juez Asociado Señor Dávila al cual se unen los Jueces Asociados Señores Torres Rigual, Martín, Díaz Cruz, Irizarry Yunqué y Negrón García.

San Juan, Puerto Rico, a 25 de abril de 1980

Se cuestiona la validez de la sentencia dictada por este Tribunal en el presente caso revocando la del Tribunal Superior a pesar de estar igualmente dividido. Fundan su ataque en la norma largamente establecida de que cuando un

tribunal apelativo se divide por igual, lo que procede es confirmar la sentencia dictada por el tribunal de instancia. *Junta Insular de Elecciones* v. *Corte*, 63 D.P.R. 819, 833 (1944). Tendrían razón si no se tratara de un pleito en el que está envuelta la validez constitucional de una medida legislativa. Procede explicar.

La regla general es que para revocar una sentencia de un tribunal o para dejar sin efecto cualquier resolución dictada por un tribunal colegiado se necesita la concurrencia de una mayoría de los jueces que intervengan. *Junta Insular de Elecciones* v. *Corte*, supra. Pero la Convención Constituyente, al redactar el Artículo Judicial de la Constitución de Puerto Rico, requirió que para que el Tribunal Supremo decrete una ley inconstitucional deben concurrir en el dictamen la mayoría de los jueces de que esté compuesto el tribunal por la Constitución o por la ley. ([1]) Son dos situaciones completamente distintas. Esto es normalmente para revocar una sentencia que se requiere una mayoría de los jueces que participan en el caso. Si no se obtiene la mayoría o si se empata la votación se confirma. Ahora bien, una vez el Tribunal adquiere jurisdicción sobre el asunto bien sea por la vía apelativa o en el ejercicio de su jurisdicción original, se requiere para dictaminar que una ley es inconstitucional la concurrencia de la mayoría de los jueces de que esté compuesto el tribunal. A ese efecto el delegado Don Jaime Benítez al discutir en segunda lectura la disposición que consideramos expresó que "la potestad de declarar una ley contraria a la constitución es una potestad consubstancial con el ejercicio de la judicatura y que no está reservada en exclusividad al Tribunal Supremo nada más que en la medida en que, claro, siendo el Tribunal Supremo el tribunal de última instancia *será su juicio el que en definitiva* gobierne la situación. . .".

([1]) Dispone así la Sec. 4 del Art. V de la Constitución de Puerto Rico:
"El Tribunal Supremo funcionará, bajo las reglas de su propia adopción, en pleno o dividido en salas compuestas de no menos de tres jueces. Ninguna ley se declarará inconstitucional a no ser por una mayoría del número total de los jueces de que esté compuesto el tribunal de acuerdo con esta Constitución o con la ley."

(Bastardillas nuestras.) *Diario de Sesiones Convención Constituyente*, (ed. 1961), T. 3, pág. 1639. Si ello no fuera así se tornaría inoperante el mandato constitucional y se frustraría el claro propósito de la Convención Constituyente: salvaguardar la voluntad de los dos poderes electos por el pueblo. Es por eso que en *Pueblo* v. *Torres Lozada,* 106 D.P.R. 588 (1977), a pesar de que cuatro de siete jueces eran de opinión que la ley bajo consideración en dicho caso era inconstitucional y tres jueces sostenían su validez (uno de los jueces no intervino) (²) se confirmó la sentencia apelada que declaró válida la ley. En palabras del delegado Señor Gutiérrez Franqui "Si no consigue esa mayoría absoluta no se puede declarar inconstitucional" el estatuto impugnado. *Diario de Sesiones Convención Constituyente,* (ed. 1961), T. 3, pág. 1642.

En *E.L.A.* v. *Aguayo,* 80 D.P.R. 552, 598–599 (1958), expresamos que a la lista de circunstancias en que el tribunal debía abstenerse de considerar cuestiones constitucionales en Puerto Rico había que añadirle otro factor, lo dispuesto en el Art. V, Sec. 4 de la Constitución de Puerto Rico. O sea, el requerimiento de una mayoría absoluta para declarar inconstitucional una ley. A ese efecto expresamos:

"Por imperativos del sistema de gobierno tanto las cortes estatales como este Tribunal han adoptado esas normas de autolimitación. *Tesorero* v. *Tribunal,* 71 D.P.R. 298, 303 (1950); *Spanish American Tobacco Co.* v. *Buscaglia,* 71 D.P.R. 991, 993 (1950); *Walker* v. *Tribunal,* 72 D.P.R. 698, 706 (1951); *Pueblo* v. *Marrero,* 79 D.P.R. 649, 652 (1956); *Gobierno de la Capital* v. *Consejo Ejecutivo,* 63 D.P.R. 434, 465 (1944); *Simonet* v. *Sandoval,* 63 D.P.R. 523, 527 (1944); *García González* v. *Tesorero,* 56 D.P.R. 655, 659 (1940); *F. Febles & Cía.* v. *Sancho Bonet,* 50 D.P.R. 778, 780 (1936); *Pueblo* v. *White Star Bus Line, Inc.,* 45 D.P.R. 153, 160 (1933). Pero hay en el caso nuestro un factor adicional. La Sección 4 del Artículo V de nuestra Constitución, al reconocer expresamente la facultad de este Tribunal para decretar la inconstitucionalidad de las leyes, provee como sigue: 'Ninguna ley se declarará inconstitucional a no ser por

---

(²) La Ley Núm. 29 de 28 de mayo de 1975 redujo el número de jueces asociados de este Tribunal a seis, pero dispuso que: "[m]ientras no surja una vacante en adición a la existente, el Tribunal continuará funcionando como está actualmente constituido".

una mayoría del número total de los jueces de que esté compuesto el Tribunal de acuerdo con esta Constitución o con la Ley.' Esa limitación no se encuentra en la Constitución federal ni en las de la gran mayoría de los estados de la Unión. ¿Por qué se incluyó en la nuestra? Afortunadamente, el extenso debate que precedió a su aprobación por la Convención Constituyente nos ofrece la respuesta. Está explicada sucintamente en las siguientes palabras:

'Yo quiero decir que hace tiempo que se viene discutiendo por las personas preocupadas por estos problemas constitucionales si es válido, si es razonable que un grupo de jueces reducido . . . tenga la prerrogativa de ir en contra de la voluntad expresada por el pueblo al ordenar un programa de legislación que es luego puesto en ejecución por los legisladores electos a base de ese programa.

'      .      .      .      .      .      .      .

'. . . Sencillamente eso lo que requiere es que una ley, y no empecemos por ley cuando ya está en los estatutos, sino que una disposición que una Cámara de Representantes creyó que era buena y que era constitucional y que un Senado creyó que era buena y que era constitucional y que un ejecutivo creyó que era buena y que era constitucional, antes de convertirse en ley, se requiera que una mayoría absoluta de los jueces para decir que no lo es, tengan que concurrir y que no pueda resultar, resuelto así, contra la propia mayoría de la Cámara, contra la opinión de la mayoría del Senado y contra la opinión del Ejecutivo, resuelto por una minoría del tribunal.'

Evidentemente, la Convención tuvo plena conciencia de la 'gravedad y delicadeza' de esta función judicial y actuó para limitarla aún más de lo que voluntariamente lo han hecho los tribunales federales."

Es pertinente apuntar que el Tribunal Supremo de los Estados Unidos en *Ohio* v. *Akron Park District*, 281 U.S. 74 (1930), sancionó una disposición constitucional similar a la nuestra que aparecía en la Constitución del Estado de Ohio hasta el 1968.

El Estado de Virginia tiene también una disposición similar. (3) La constitución requería que concurrieran tres

---

(3) Si bien en el informe de la Comisión de la Rama Judicial de la Convención Constituyente se incluye la Constitución de Carolina del Norte como que contiene una disposición igual a la nuestra, examinada la misma encontramos que es similar a

jueces—el tribunal estaba compuesto de cinco magistrados—
para que se declarara una ley inconstitucional. Allí surgió
una situación como la que aquí considerámos y enmendaron
la constitución para que en casos donde estuviera presente
una cuestión constitucional y existiera una vacante en el
tribunal o no pudieran participar todos los jueces, la Asamblea
Legislativa aprobara legislación estableciendo el método
para cubrir temporalmente la vacante existente y así evitar
la división por igual.

Luego de la enmienda el Tribunal de última instancia de
Virgina se dividió por igual en un caso en el que no se atacaba
la validez constitucional de un estatuto. Dictó sentencia
confirmando. La parte apelante solicitó se reconsiderara la
sentencia. Invocó la disposición constitucional a que antes
aludimos. El Tribunal negó la reconsideración solicitada
expresando que la enmienda a la Constitución se aplicaba
solamente cuando estaba envuelta en el litigio una cuestión
constitucional. Al fallar expresó:

"La Constitución que precedió la que está vigente proveía que 'la
concurrencia de una mayoría de los jueces electos al tribunal será
requerida para declarar cualquier ley nula e inválida, por motivo
de su incompatibilidad con la constitución federal o con la consti-
tución de este estado.' La disposición de la constitución anterior
sobre este asunto se consideró inadecuada por la convención que
redactó la constitución actual, y ésta insertó en su lugar la

la que contenía la de Puerto Rico antes de la enmienda de 1960 en lo referente a que
las opiniones de salas debían tener la anuencia de la mayoría de los jueces. En lo
referente a la disposición que consideramos en este recurso sólo dispone: "... ningún
caso que requiera interpretar la constitución del estado o de los Estados Unidos se
decidirá excepto por el tribunal en pleno". A continuación las disposiciones
pertinentes de las constituciones de Carolina del Norte y de Puerto Rico:

"No decision of any division shall become the judgment of the court unless
concurred in by a majority of all the justices; and no case involving a construction of
the Constitution of the State or of the United States shall be decided except by the
court en banc. . . ."

"El Tribunal Supremo funcionará, bajo reglas de su propia adopción, en pleno o
dividido en salas. Todas la decisiones del Tribunal Supremo se adoptarán por
mayoría de sus jueces. Ninguna ley se declarará inconstitucional a no ser por una
mayoría del número total de los jueces de que esté compuesto el tribunal de acuerdo
con esta Constitución o con la ley."

disposición según consta en la actualidad, que declara que 'la concurrencia de por lo menos tres jueces será requerida para determinar el tribunal que cualquier ley es o no es incompatible con la constitución de este estado o de los Estados Unidos.' Donde la constitucionalidad de una ley se cuestiona, está claro, por tanto, que la concurrencia de tres jueces es necesaria para decidir el caso. Un número·menor no puede decidir que una ley es constitucional o inconstitucional. La concurrencia de tres jueces es esencial para la decisión, es un requisito jurisdiccional y un número menor de jueces no tendría autoridad para emitir decisión alguna en semejante caso. La convención se impresionó con la delicadeza e importancia de la jurisdicción ejercida por los tribunales al pasar sobre la constitucionalidad de una ley. Entendió que la disposición sobre el asunto en la constitución anterior, la cual únicamente tenía el alcance de sostener que una ley no podía ser declarada nula e inválida, por ser incompatible con la constitución de los Estados Unidos o del estado, a menos que tres de los jueces del tribunal concurrieran en el resultado, no cumplía totalmente con las necesidades de la situación, pues bajo la ley según constaba una ley inconstitucional podría, en un caso particular, ser obligatoria para las partes en el litigio debido a una división por igual entre los jueces que componen el tribunal. Consideró que todos los casos en los cuales se cuestiona la constitucionalidad de una ley son de primordial importancia; que ningún estatuto que trasciende la ley fundamental debe hacerse cumplir por ningún ciudadano; y por consiguiente requirió la concurrencia de tres jueces para disponer de la controversia y prohibió cualquier decisión a favor o en contra de la validez de la ley por un tribunal igualmente dividido. El mal que la convención trató de remediar era claro y obvio; el remedio que dispuso es adecuado y completo." *Funkhouser* v. *Spahr*, 46 S.E. 378 (1904).

Considerado lo anteriormente expuesto, sólo podría sostenerse dogmática e inflexiblemente, que siempre que el tribunal se divide por igual se confirma la sentencia recurrida o apelada. Frente a tal regla general hemos destacado el alcance de la disposición especial de nuestra Constitución. No creemos que pueda seriamente sostenerse que la regla general predomine sobre la clara y lógica intención de la Asamblea Constituyente al aprobarse la Sec. 4 del Art. V de la

Constitución. Si así no fuera, se anularía una disposición constitucional.

Finalmente, la afirmación del compañero Juez Rigau al efecto de que la sentencia dictada en este caso "revoca una norma de seis siglos, norma que a los trece días vuelve el Tribunal a reestablecer" carece de fundamento. El Tribunal no revocó norma alguna. Si en la misma fecha en que se resolvió el caso de autos este Tribunal se hubiera dividido por igual en un caso en que no se impugnara una sentencia declarando inconstitucional una ley se hubiera confirmado la dictada por el Tribunal Superior. La actuación de este Tribunal en el presente caso se ajusta a lo que dispone la Sec. 4 del Art. V de la Constitución de Puerto Rico transcrita en el escolio (1). La regla a que el compañero Rigau alude como adoptada 13 días después de dictada la sentencia se refiere simplemente a una directriz del pleno respecto al orden en que deben publicarse las opiniones emitidas por los distintos jueces cuando el Tribunal se divide por igual en cuya directriz meramente se alude a la norma inveterada de confirmar la sentencia apelada al dividirse por igual el Tribunal. (⁴) Es erróneo, por tanto, afirmar que este Tribunal

(⁴) En comunicación dirigida por el Señor Juez Presidente al Secretario de este Tribunal el 11 de marzo de 1980 le informa:

"Estimado señor Secretario:

En su sesión plenaria de hoy el Tribunal consideró su memorándum de 24 de septiembre de 1979, relativo a las opiniones de este foro.

Se adoptaron las siguiente normas:

'Opinión del Tribunal' es aquella que cuenta con el voto de la mayoría de los jueces que intervienen en el caso, siempre que la opinión tenga un mínimo de tres votos. Debe entenderse que una opinión tiene el voto de un juez cuando éste se une a la opinión, es decir, cuando está totalmente conforme. Un voto u opinión concurrente será contado como un voto a favor del resultado, pero no de la opinión.

Cuando además de la opinión del tribunal se emiten otras opiniones, la sentencia del Tribunal hará constar que se emitieron dichas opiniones y se hará referencia a las mismas en el orden de publicación, a saber:

1. Opiniones concurrentes, en orden de antigüedad.
2. Opiniones concurrentes en parte y disidentes en parte, en orden de antigüedad.
3. Opiniones disidentes, en orden de antigüedad.

En caso de que el Tribunal esté igualmente dividido, se emitirá una sentencia haciendo constar que se confirma el dictamen recurrido por estar el Tribunal

revocó una norma en este caso y la restituyó trece días después mediante una directriz.

La revocación por empate de la sentencia en este caso reconoce la excepción ordenada para cuando está siendo considerada la constitucionalidad de una ley. A diferencia de la revocación usual que requiere una mayoría, ésta se produce por la simple insuficiencia de votos dentro del "número total de los jueces de que esté compuesto el Tribunal" según dispone la Constitución en su Art. V, Sec. 4. No es, por tanto, decisión del Tribunal sino eficacia del mandato constitucional lo que impone la solución.

—O—

Opinión del Juez Asociado Señor Negrón García.

San Juan, Puerto Rico, a 25 de abril de 1980

Todo parece indicar que este recurso se niega a reposar. Al sostener en nuestro disenso previo que la asignación de fondos públicos para las primarias presidenciales era inconstitucional, también reconocimos que el empate en la votación conllevaba la revocación de la sentencia por no haber mayoría absoluta, aún conscientes de que una interpretación contraria favorecía nuestra solución jurídica.

I

Por ser una norma de excepción de trascendental importancia en la operación interna institucional de este foro y en el desarrollo futuro de otras controversias de carácter constitucional, hemos de dejar clara e inequívoca constancia de sus bases y dimensiones. En *E.L.A.* v. *Aguayo*, 80 D.P.R. 552, 598–599 (1958), se dijo:

igualmente dividido. En caso de emitirse más de una opinión, el orden de publicación será el siguiente:

1. Opiniones concurrentes, en orden de antigüedad (opinión concurrente es aquella que está de acuerdo en confirmar).

2. Opiniones disidentes, en orden de antigüedad (opinión disidente es aquella que está de acuerdo en revocar).

.    .    .    .    .    .    .    ."

"... La Sección 4 del Artículo V de nuestra Constitución, al reconocer expresamente la facultad de este Tribunal para decretar la inconstitucionalidad de las leyes, provee como sigue: 'Ninguna ley se declarará inconstitucional a no ser por una mayoría del número total de los jueces de que esté compuesto el Tribunal de acuerdo con esta Constitución o con la Ley.' Esa limitación no se encuentra en la Constitución federal ni en las de la gran mayoría de los estados de la Unión. ¿Por qué se incluyó en la nuestra? Afortunadamente, el extenso debate que precedió a su aprobación por la Convención Constituyente nos ofrece la respuesta. Está explicada sucintamente en las siguientes palabras:

'Yo quiero decir que hace tiempo que se viene discutiendo por las personas preocupadas por estos problemas constitucionales si es válido, si es razonable que un grupo de jueces reducido... tenga la prerrogativa de ir en contra de la voluntad expresada por el pueblo al ordenar un programa de legislación que es luego puesto en ejecución por los legisladores electos a base de ese programa.

'     .       .       .       .       .       .       .

'... *Sencillamente eso lo que quiere es que una ley, y no empecemos por ley cuando ya está en los estatutos, sino que una disposición que una Cámara de Representantes creyó que era buena y que era constitucional y que un Senado creyó que era buena y que era constitucional y que un ejecutivo creyó que era buena y que era constitucional, antes de convertirse en ley, se requiera que una mayoría absoluta de los jueces para decir que no lo es, tengan que concurrir y que no pueda resultar, resuelto así contra la propia mayoría de la Cámara, contra la opinión de la mayoría del Senado y contra la opinión del Ejecutivo, resuelto por una minoría del tribunal.*'

Evidentemente, la Convención tuvo plena conciencia de la 'gravedad y delicadeza' de esta función judicial y actuó para limitarla aún más de lo que voluntariamente lo han hecho los tribunales federales." (Bastardillas nuestras.)

Si bien este pronunciamiento no dictaminó la incógnita planteada por vez primera en este caso, permite ubicarnos conceptualmente, como punto de partida para explorar y enunciar, de manera breve, pero sistemática, los horizontes de esta interesante disposición. Además, ilustra en parte la clara visión e intención de la Asamblea Constituyente— apuntalada en el axioma sobre balance y separación de

poderes públicos—de exigirle a este foro colegiado, el criterio de mayoría absoluta en nuestras decisiones invalidando un estatuto por inconstitucional.

¿Qué razones y aspectos cubre esta limitación? ¿Qué consecuencias tiene? Para formular respuestas autorizadas la mejor fuente es adentrarnos en el propio debate de la Asamblea Constituyente mediante un estudio meticuloso. Con el beneficio de esta perspectiva integral e histórica revisitémosla.

Lo primero que observamos es la similitud que existe entre la norma especial de mayoría absoluta de votos judiciales, con el método de votación establecido y usado por la Constituyente para la ordenación y votación de sus decisiones esenciales.

A tal efecto, su Reglamento disponía que "para la aprobación de cualquier resolución, proposición, sección o artículo de la Constitución [era necesario] una mayoría absoluta de los miembros electos. . . ." Regla XIV, inciso 17, *Diario de la Convención Constituyente*, 105 (1961). Este sistema de votación también se exigía "para variar el orden de los asuntos" (IX, 3); para la Convención "relevar a una comisión de la consideración de cualquier proposición o resolución y traerla ante sí para su consideración en comisión total" (XIV, 4); para "enmendar en segunda lectura, el texto enrolado" (*id.*, 7); y para referir "a la Comisión de Redacción, Estilo y Enrolado" (*id.*, 9). *Op. cit.*, 102–104.

La razón de ser de la reciprocidad y equiparación en la mecánica de votación es evidente. Si para la aprobación de una disposición constitucional se exigía una mayoría absoluta lo lógico y natural era que se requiriese igual criterio para anularse un estatuto por el Poder Judicial.

En segundo lugar, la posibilidad de que ocurriera un empate en un caso de envergadura constitucional ante este Tribunal—como ocurrió en el caso de autos—no pasó desapercibida por los autores que confeccionaron nuestra Constitución. Sobre este extremo el récord revela que luego del delegado

Sr. Gutiérrez Franqui aclarar que mediante la norma de mayoría absoluta se había "querido dejar establecido la validez del principio de que todo estatuto se presume constitucional", el delegado, Sr. García Méndez, se manifestó—refiriéndose a este Tribunal, entonces compuesto de cinco (5) magistrados, y bajo la hipótesis de que uno estuviera ausente—que "en caso de que haya cuatro [(4) jueces], si hay cuatro, dos *no pueden declararla inconstitucional porque el empate es a favor del mantenimiento de la ley...*". (Bastardillas nuestras.) (*Op. cit.*, 568–569.) Nadie cuestionó este ejemplo y su conclusión. Su corrección queda robustecida al advertir que los protagonistas principales de este diálogo eran juristas *familiarizados* con la regla tradicional de que un empate en un foro apelativo judicial—a base de la *ficción* de que se suma y cuenta el del juez de instancia—de ordinario implica la confirmación de la decisión. No obstante, reconociendo que la norma de mayoría absoluta era una distinta y singular, todos coincidieron que ante la eventualidad de un empate, el Tribunal Supremo *no* podía declararla inconstitucional porque el impasse de igual número de votos representaría una decisión a "favor del mantenimiento de la ley".

Tercero. La norma que nos ocupa es de estricto y fiel cumplimiento. Su rigor no mengua porque este Tribunal no esté totalmente integrado, debido e incluso, a la existencia de vacantes. *Op. cit.*, 570, 1640. Como norma de excepción, sólo cubre al Tribunal Supremo apareciendo suficiente "consta[ncia] en las deliberaciones de [la] Convención respecto del poder de otros tribunales [de instancia] para declarar anticonstitucional o inconstitucional una ley". *Op. cit.*, 1639.

Cuarto. Esta norma no se extiende a un decreto de inconstitucionalidad de una ordenanza municipal o un reglamento, para cuyas decisiones, sólo se necesita "simplemente mayoría". *Op. cit.*, 1647. El entonces delegado, hoy Presidente de este foro, Sr. Trías Monge, resumió así este aspecto:

"...¿podría decirse que la regla sería la siguiente: O sea, que esta sección se refiere exclusivamente a ejercicios de poder legislativo

como tal o [a] la Asamblea Legislativa y no al ejercicio de poderes legislativos, delegados; o sea, por organismos vía reglamentos, por asamblea municipal vía ordenanza, por decretos vía expresión de la junta como salario mínimo, a menos que, en este último caso la Asamblea Legislativa expresamente la adopte como ley. Sr. RAMOS ANTONINI: La contestación es en la afirmativa." *Op. cit.*, 1645.

Y finalmente, un pronunciamiento de inconstitucionalidad cierra los tribunales "desde ese momento ante el intento de cualquiera que pretendiera exigir cumplimiento de cualquiera de esas leyes que el propio Tribunal Supremo ha declarado nulas. Queda cerrado todo. No existe. Ese es el resultado". *Op. cit.*, 1647.

## II

Recapitulando, hemos demostrado que la norma que exige mayoría absoluta en un decreto de inconstitucionalidad es de excepción y de rigurosa aplicación a este foro. Está cimentada sobre la teoría fundamental de *frenos y contrapesos*, tiende a reforzar la presunción de constitucionalidad, rige tanto en casos de jurisdicción original como apelativa, y sólo aplica cuando se trata de invalidar estatutos.

Ante estos claros antecedentes resulta forzada y errónea la interpretación abogando que un empate en este foro confirma un decreto de inconstitucionalidad de un tribunal de instancia. Equivaldría a sostener la inconstitucionalidad de una ley sin concurrir el voto de "una mayoría del número total de los jueces de que est[á] compuesto" este Tribunal. Sin necesidad de esforzarnos en buscar apoyo en otras jurisdicciones, el legajo de la Convención Constituyente refleja indubitadamente que dicho curso de acción sería conflictivo con la letra y espíritu de la Sec. 4, Art. V, antes citada. Por sabia que sea la regla general sobre empate, por ilógica que en algunas de sus fases pudiera estimarse la aplicación de la norma de mayoría absoluta, en este terreno el jurisprudente ha de comprender que ninguna costumbre, tradición, o

ficción puede ir en contra o ignorar el mandato expreso de la Constitución.

—O—

Opinión disidente del Juez Asociado Señor Rigau.

San Juan, Puerto Rico, a 25 de abril de 1980

Como sabe el país, los hechos relacionados con este caso ya se han consumado. Se trata de la impugnación de la Resolución Conjunta Núm. 79 de 12 de julio de 1979, la cual autorizó el uso de fondos públicos del Tesoro de Puerto Rico para la celebración en este país de unas primarias presidenciales sobre candidatos a la presidencia de los Estados Unidos de América.

Los puertorriqueños residentes en Puerto Rico no votan por el Presidente de los Estados Unidos. Implícitamente optaron por no hacerlo al endosar, en el Referéndum celebrado el 23 de julio de 1967, el *status* político vigente de Estado Libre Asociado. Como nada importante se recibe realmente gratis, lo que no se paga con valores materiales se paga con valores·morales. Tal parece que la generación que votó en el citado Referéndum prefirió no reclamar la facultad de votar por el Presidente de los Estados Unidos para en cambio retener otros valores—derecho a la autodeterminación, autonomismo, etc.—que juzgó más importantes. [1]

En el caso de autos se produjo una Sentencia del Tribunal de una página con fecha de 27 de febrero de 1980. Se han escrito, además, cinco opiniones y votos particulares de los distintos Jueces, concurriendo algunos entre sí. Algo parecido ocurrió en el caso del *P.P.D.* v. *Ferré, Gobernador*, 98 D.P.R. 338 (1970), el cual versaba sobre la forma de llevarse a cabo los resultados y consecuencias del antes mencionado Referéndum o Plebiscito del 23 de julio de 1967. Allí tampoco hubo

[1] Para una síntesis del trasfondo histórico del Plebiscito véase la opinión del autor de estas líneas en 98 D.P.R. págs. 429 a la 447. Para un tratamiento más extenso del tema y una excelente colección de documentos véase Antonio Fernós Isern, *Estado Libre Asociado de Puerto Rico*, Ed. Universitaria, 1974.

una opinión del Tribunal como tal. En aquel caso, de un Tribunal compuesto por nueve jueces, seis de ellos emitieron opiniones y votos individuales. Síntoma éste de lo profundas que son las diferencias entre los puertorriqueños sobre estos asuntos.

Dos aspectos de este caso voy a considerar en esta opinión. El primero se refiere a un error de derecho que a mi juicio contiene la mencionada Sentencia emitida por el Tribunal. En el segundo discuto una confusión de conceptos y de expresión que advierto en los escritos sometidos y que también advertí en la vista oral del caso. Considero importante hacer esta aclaración porque si los términos que se discuten no están desde el comienzo definidos y bien entendidos, toda discusión presente y futura sobre el asunto añadirá más confusión al mismo, cuando lo que se necesita es un buen entendimiento en nuestra jurisprudencia y en el país de las cuestiones y valores envueltos.

I(a)—*La norma general*: Cuando un tribunal de apelación se divide por igual la sentencia del tribunal apelado queda en pie.

La sentencia en este caso nos informa que vista la Constitución y por estar igualmente dividido el Tribunal se revoca la sentencia del Tribunal Superior. En esa forma se revoca una norma de seis siglos, norma que a los trece días vuelve el Tribunal a reestablecer. Paso a explicarme.

La sentencia del Tribunal Superior no fue realmente revocada ni confirmada. Esto es así porque en este caso el Tribunal Supremo quedó igualmente dividido. Al quedar así dividido el Tribunal no pudo decidir la cuestión en una forma u otra. Por eso es un error creer que el empate confirma la Sentencia del tribunal apelado como también lo sería creer que la revoca. El empate obviamente no produce decisión en un sentido u otro y como resultado la sentencia del tribunal de instancia queda en pie.

Es universal y antigua la norma de que cuando el tribunal de apelación se divide por igual, la sentencia del tribunal

apelado queda en toda su fuerza y vigor. Para no hacer innecesariamente larga esta opinión, no vamos a incluir aquí una exégesis de la historia de dicha norma. Baste decir que la misma data de por lo menos desde el Siglo XIV. *Durant* v. *The Essex Co.*, 7 Wall. 107; 19 Law. Ed. 154 (1869). Luego de señalar allí que esa es la doctrina firmemente establecida, el Tribunal Supremo de los Estados Unidos expresó en dicho caso: "If the judges are divided, the reversal cannot be had, for no order can be made." 19 Law. Ed. 157.

Eso ha sido así en Puerto Rico y en los Estados Unidos. Ya desde el año 1909 en los casos de *Saldaña* v. *Consejo Municipal*, 15 D.P.R. 37, 39 y *Falero* v. *Falero*, 15 D.P.R. 118, reconocimos la mencionada norma. Lo hemos seguido haciendo así consistentemente. Véanse casos recientes en los cuales este Tribunal consistentemente resuelve que por estar igualmente dividido el Tribunal *se confirma* la sentencia recurrida. *Srio. de Instrucción* v. *Quiñones Díaz*, 108 D.P.R. 344; *Pueblo* v. *Báez Cartagena*, 108 D.P.R. 381; y *Rodríguez Sardenga* v. *Soto Rivera*, 108 D.P.R. 733; todos resueltos en el año 1979. (²)

En los Estados Unidos el Tribunal Supremo federal reconoció la norma en *The Antelope*, 10 Wheat. 66, 6 L.Ed. 268 (1825). Dicho Tribunal lo ha venido haciendo también consistentemente. Lo que antes hemos citado del caso de *Durant* v. *The Essex Co.*, supra, del año 1869 fue reiterado no hace mucho en *Neil* v. *Briggers*, 409 U.S. 188, 189–192 (1972). (³)

(²) Para otros casos de Puerto Rico en el mismo sentido véase *Pueblo* v. *Delgado Rodríguez*, 108 D.P.R. 196, (1978); *Díaz* v. *Ramos*, 51 D.P.R. 822, 824 (1937); *Domínguez* v. *Fabián*, 37 D.P.R. 667, 668 (1928); *Sucn. Nieves* v. *Sucn. Sánchez*, 17 D.P.R. 872 (1911).

(³) Para otros casos del Tribunal Supremo de los Estados Unidos resueltos en igual forma véanse *Laird* v. *Tatum*, 409 U.S. 824, 837, 838 Memo of Relinquist (1972); *United States* v. *Chas. Pfizer & Co., Inc.*, 404 U.S 548 (1972); *Eaton* v. *Price*, 364 U.S. 263, 263–264 (1960); *Lewis* v. *Benedict Coal Corp.*, 361 U.S. 459, 464 (1960); *Nye* v. *United States*, 313 U.S. 33, 44 (1941); *United Gas Co.* v. *Texas*, 303 U.S. 123, 146 (1938); *Moffitt* v. *Milller*, *136 U.S. 643, 34 L.Ed. 539 (1889)*; *Miller* v. *Richard*, 131 U.S. 429, 33 L.Ed 212 (1889); *Continental Ins. Co.* v. *Wright*, 131 U.S. 432, 33 L.Ed.

Por si hubiese dudas sobre la actual vigencia en Puerto Rico de la norma que discutimos, a los 13 días de emitida la sentencia en el caso de autos, el 11 de marzo de 1980, el Pleno de este Tribunal acordó que "En caso de que el Tribunal esté igualmente dividido, se emitirá una sentencia haciendo constar que se confirma el dictamen recurrido por estar el Tribunal igualmente dividido". [4]

I(b)—*La Sección 4 del Artículo V de la Constitución de Puerto Rico*: Dispone la Constitución en la sección citada que "Ninguna ley se declarará inconstitucional a no ser por una mayoría del número total de los jueces de que esté compuesto el tribunal . . .".

Como puede verse esa limitación está escrita para aplicarse y se aplica solamente al Tribunal Supremo, que es un Tribunal colegiado. Por ser colegiado es que el Tribunal Supremo puede fallar casos por unanimidad o por mayoría. En cambio, las Salas del Tribunal Superior están presididas por un solo Magistrado y es imposible que al fallar un caso un Magistrado divida su persona, digamos, en $\frac{5}{8}$ partes en contra de la constitucionalidad de una ley y en $\frac{3}{8}$ partes a favor de dicha constitucionalidad.

En la Convención Constituyente se discutió el asunto que nos ocupa. El Delegado Don Jaime Benítez planteó que podría surgir la duda de que sólo fuese el Tribunal Supremo quien pudiese declarar inconstitucional una ley. Comentó que esa es una potestad consubstancial con el ejercicio de la judicatura y que esa facultad no está reservada en exclusividad al Tribunal Supremo. Preguntó si la medida en discusión

---

210 (1889); *Bauer* v. *Texas & P.R. Co.*, 131 U.S. 430, 33 L.Ed. 209 (1889); *Coleman* v. *Hudson River Bridge Co.*, 2 Wall. 403, 17 L.Ed. 876 (1865); *Jewell* v. *Jewell*, 1 How. 219, 11 L.Ed. 108 (1843); *Washington Bridge Co.* v. *Stewart*, 3 How. 413, 11 L.Ed. 658 (1845); *Benton* v. *Woolsey*, 12 Pet. 27, 9 L.Ed. 987 (1838) y *Etting* v. *Bank of the United States*, 11 Wheat. 59, 6 L.Ed. 419 (1826).

    [4] Carta del Juez Presidente al Lic. Ernesto L. Chiesa, Secretario General del Tribunal Supremo, de 11 de marzo de 1980 en la cual le informa que en la reunión del Pleno "se adoptaron las siguientes normas". Aunque se alegue lo contrario, la cita es textual y así consta del propio documento citado.

limitaría la facultad de declarar leyes inconstitucionales al Tribunal Supremo.

El Delegado Don Ernesto Ramos Antonini, contestando al señor Benítez, expresó que "[L]a información es en el sentido de que esta limitación de que aquí se habla *se refiere exclusivamente al Tribunal Supremo. . . . Estamos hablando del Tribunal Supremo nada más y a él nada más es que nos referimos para limitar su facultad,* no para limitar la facultad o el poder judicial del poder judicial en general." (Bastardillas nuestras.) 3 *Diario de Sesiones de la Convención Constituyente de Puerto Rico,* Ed. Equity de 1961, pág. 1639.

No puede argüirse con validez que lo anterior supone que un Juez Superior puede hacer lo que una minoría del Tribunal Supremo no puede hacer. En primer lugar, aparte de la disposición constitucional que discutimos, así es en todos los demás casos. Un Juez Superior decide los casos de derecho civil y constitucional. Una mayoría o una minoría de una de sus Salas no puede dividirse, porque se trata de un solo Magistrado.

Como se sabe, en el Tribunal Supremo para decidir un caso deben concurrir la mayoría del Pleno o la mayoría de una de sus Salas. Pero regresando a la cuestión que comentamos, que es cuando se trata de declarar inconstitucional una ley, tampoco en esos casos puede argüirse que si la división por igual en el Tribunal Supremo tiene como resultado que la sentencia recurrida queda en pie, entonces quedarían a merced del Tribunal de Primera Instancia la validez de la legislación y de los programas del gobierno. No sería así porque si una sentencia en el Tribunal Superior le es adversa al Gobierno al declarar dicho tribunal una ley inconstitucional, siempre el Gobierno, si lo interesa, puede venir en alzada al Tribunal Supremo y en este Tribunal, salvo que se divida por igual, se resolvería el caso por unanimidad o por la mayoría del mismo. De manera que la protección de recurrir al Tribunal Supremo siempre existe.

I(c)—*Lo de la Separación de Poderes*: Sobre la separación

de poderes, es por todos conocida la explicación escolar clásica: La Constitución establece un gobierno dividido en tres ramas iguales, la legislativa, la ejecutiva y la judicial. La legislativa hace las leyes, la ejecutiva las pone en vigor y la judicial las aplica a los casos concretos que ante los tribunales se litigan. Desde luego, la realidad no es tan sencilla como eso.

Para dar un solo ejemplo de que la realidad de gobernar es más compleja que el sencillo diagrama antes descrito, recuérdese que en prácticamente todos los gobiernos, incluyendo las democracias, la mayor parte de la legislación y especialmente la más importante—la del programa del gobierno—se origina mediante propuestas que hace la rama ejecutiva. Propuestas éstas que el Ejecutivo frecuentemente somete al Legislativo en forma de borradores de proyectos de ley acompañados de memorandos en los cuales se exponen las razones por las cuales se solicita esa legislación.

Eso supone unos acuerdos previos del *caucus* de la mayoría—que incluye al Legislativo y al Ejecutivo—sobre las líneas generales de esa legislación. Supone también que el *caucus* de la minoría, por lo menos del segundo partido en importancia, también celebra reuniones y toma acuerdos sobre la legislación que favorece y sobre la que objeta. Para un examen más a fondo del concepto de separación de poderes y de su funcionamiento en la realidad, véase lo expresado en 98 D.P.R., págs. 453–460.

Los trabajos legislativos que brevemente sugerimos en el párrafo anterior—reuniones, acuerdos de *caucus*, etc.—incluyen con frecuencia la discusión de graves y profundas discrepancias internas que requieren para su síntesis grandes capacidades de liderato y de persuasión.

Según las ramas legislativa y ejecutiva son directamente responsables al electorado, la rama judicial es moralmente responsable a la opinión pública y, especialmente en el aspecto técnico de su trabajo, es responsable a la comunidad jurídica del país, comunidad ésta compuesta por todos los

jueces, por los abogados y por los profesores y estudiantes de derecho.

Como se sabe, corresponde a la rama judicial el interpretar y aplicar la Constitución y las leyes. Esta función, denominada revisión judicial ha dado margen desde sus orígenes hasta el presente a una controversia que aún continúa y la cual ha dado motivo para centenares de artículos y docenas de libros. El número en ambos casos, estoy seguro, es mayor pero no quiero parecer que exagero. (5) Esa literatura incluye desde los artículos periodísticos del Juez Presidente de los Estados Unidos John Marshall escritos en defensa de su opinión en el célebre caso de *Marbury* v. *Madison*, 1 Cranch 137, 2 L.Ed. 60 (1803) (6) hasta los libros recién publicados sobre dicha controversia.

No hay duda de que es un valor importante de nuestro sistema constitucional y político el respeto de una rama de gobierno hacia la otra. Dicha norma es básica tanto para la vida pública pacífica como para el debido funcionamiento de nuestro derecho constitucional. Pero al referirnos a los orígenes de la cláusula específica de nuestra Constitución que exige la mayoría absoluta del Tribunal Supremo para declarar una ley inconstitucional, la realidad es que hay en el trasfondo de dicha cláusula dos factores históricos que explican su existencia.

Uno es que la generación que aprobó nuestra Constitución fue la generación que vio cómo un Tribunal Supremo (el de los Estados Unidos) dominado por una mayoría de jueces conservadores declaró inconstitucional la legislación social del Nuevo Trato dirigida por el entonces presidente Franklin D. Roosevelt. Dicha legislación, por considerarse urgente y necesaria

---

(5) Para esta abundantísima e interesante literatura consúltese, entre otras fuentes, el *Index to Legal Periodicals* y el catálogo de bibliotecas tales como la Biblioteca General y la de Derecho de la Universidad de Puerto Rico y la del Tribunal Supremo.

(6) Publicados con una Introducción en *John Marshall's Defense of McCulloch* v. *Maryland*, por Gerald Gunther, Stanford Univ. Press, Calif., 1969.

debido a la crisis económica de los años 30, tenía en aquella época amplio respaldo mayoritario en los Estados Unidos.

Los que vivieron, o han leído sobre aquellos años, recordarán las profundas inquietudes que aquella postura conservadora del Tribunal Supremo federal produjo en aquel país. Al cambiar el Juez Roberts de criterio y dejar el bloque conservador para unirse al bloque liberal hizo posible la subsiguiente declaración de validez de dicha legislación y pudo continuarse la reforma social que entonces el país reclamaba y respaldaba. Benjamín Wright, *The Growth of American Constitutional Law*, Boston, Ed. Houghton Mifflin Company, 1942, págs. 180–241.

El segundo factor a que me he referido y que también explica la existencia en la Constitución de Puerto Rico de la cláusula sobre la mayoría absoluta antes mencionada, consiste en que en los años en que se redactó y aprobó nuestra Constitución la mayoría política en Puerto Rico estaba dirigida por unos líderes liberales [7] que habían visto las vicisitudes ya mencionadas que la legislación del Nuevo Trato había sufrido al toparse con un Tribunal Supremo conservador.

Ese grupo de líderes deseaba evitar, en lo posible, que algo así ocurriese en Puerto Rico. Recuérdese que para los años 1944 al 1948 presidía el Tribunal Supremo Don Martín Travieso, persona alegadamente conservadora y prominente en el Partido Republicano de Puerto Rico. Tan es así que en agosto de 1948 renunció a la Presidencia del Tribunal Supremo para ser candidato a la gobernación y adversario del candidato Luis Muñoz Marín. En dicha aventura política el Sr. Travieso no tuvo éxito. [7a]

[7] Entre otros, vienen a la memoria Luis Muñoz Marín, Jaime Benítez, Antonio Fernós Isern, Ernesto Ramos Antonini, Samuel R. Quiñones, Luis Negrón López, Víctor Gutiérrez Franqui, Santiago Polanco Abreu, Fernando Sierra Berdecía, María Libertad Gómez, Juana Rodríguez Mundo, Petroamérica Pagán de Colón, Rafael Picó, Teodoro Moscoso, Ramón Colón Torres, Felisa Rincón de Gautier, Roberto Sánchez Vilella, Arturo Morales Carrión.

[7a] Esa fue la elección de 1948. Ese año el Partido Unión Republicana adoptó el nombre de Partido Estadista Puertorriqueño y con ese nombre fue a la elección. En

Debido a aquellas circunstancias existía preocupación ante la posibilidad de que el Tribunal Supremo declarase inconstitucional la legislación social que entonces se había recién aprobado y que también gozaba de un amplio respaldo mayoritario en Puerto Rico.

Por eso dicha cláusula tiene el propósito de asegurar que el Tribunal Supremo de Puerto Rico no pueda livianamente declarar inconstitucional legislación aprobada por el legislativo y el ejecutivo.

II. *Nación, Estado, Nacional, Federal:* Como indiqué al comienzo de esta opinión, el segundo tema que estimo conveniente y necesario tratar consiste en un esfuerzo por aclarar cierta confusión que creo haber notado en el uso de ciertos términos y conceptos en los planteamientos hechos por las partes. Estimo necesario este esfuerzo por aclarar esos términos porque creo que es necesario tenerlos claros para poder pensar jurídicamente con precisión y con validez sobre los mismos. No intereso ni voy a hacer valoraciones políticas sobre esos términos. Éste no es el foro para ello. Pero sí es el foro para precisar y aclarar los términos y conceptos que se utilizan en nuestro derecho y en nuestra jurisprudencia.

En los materiales sometidos sobre este caso veo que se utilizan indiscriminadamente los términos, nación, estado, nacional y federal. Dichos términos no son sinónimos.

El término "nación" es un concepto cultural. El término "estado" es un concepto político. Primero aclaremos que aquí utilizamos el término "estado" no en el sentido en que se utiliza dicho vocablo en el derecho constitucional doméstico de los Estados Unidos, en cuyo sentido los estados que forman la Unión son como provincias o departamentos, los cuales todos juntos forman el Estado que en el derecho internacional se conoce como Estados Unidos de América.

---

1953 el Partido Estadista Puertorriqueño cambió su nombre para llamarse Partido Estadista Republicano. A pesar de los cambios de nombre, en términos generales, el grupo de líderes y su masa electoral eran los mismos. Proponían, igual que ahora, la estadidad.

- Aquí utilizamos el vocablo Estado en el sentido internacional que representa un país separado políticamente de los demás. La mayor parte de los Estados (Francia, Italia, Alemania, Holanda, Suecia, etc.) contienen una nación. Así un italiano se sabe cultural y políticamente italiano y no hay en su ánimo duda de si es francés o inglés, etc.

Cuando coinciden dentro de los mismos límites territoriales un estado político y una nación cultural comprenden una nación-estado. Esta es la situación normal y la más cómoda para la convivencia de sus habitantes entre sí y de sus habitantes y su gobierno.

El concepto "nación", como ya indicamos, es un concepto cultural e implica una población que habla el mismo idioma y comparte las mismas tradiciones, religión, origen o composición étnica, historia e idiosincracia. No todos estos elementos tienen que concurrir a la vez, pero sí los suficientes para darle a esa población su carácter nacional.

Según hay estados que comprenden dentro de sus límites a una sola nación (aunque, claro está, esto no quiere decir que absolutamente todos sus habitantes sean miembros de ese grupo nacional) hay estados multinacionales, esto es, que comprenden dentro de sus límites políticos y territoriales a más de una nacionalidad cultural.

Ejemplos de estos Estados multinacionales son Suiza, Canadá y Bélgica, entre otros. Suiza comprende una población que contiene miembros de tres nacionalidades, culturalmente hablando. El Estado Suizo se compone de ciudadanos suizos, pero unos tienen características nacionales alemanas, otros, francesas y otros italianas. Cerca del 80% de los canadienses son culturalmente ingleses y hablan inglés y casi la totalidad del balance son culturalmente franceses y hablan francés.

Otro tanto ocurre en Bélgica. Su población es de aproximadamente 10 millones de habitantes. Aproximadamente el 60% tienen las características nacionales holandesas y se denominan flamencos. El restante 40% tiene las características nacionales francesas y se conocen como walones. La

población alemana de Bélgica está mayormente situada en la parte este del país. Hacia el suroeste se encuentran los de origen celta y latino. También existe en la parte oriental de Europa un número de pequeños estados, cuyas fronteras han variado con motivo de las dos últimas guerras mundiales y los cuales comprenden un verdadero mosaico de distintas nacionalidades ubicadas dentro de distintos estados políticos. (8)

Históricamente y por regla general cuando dentro de un estado político conviven varios grupos nacionales distintos, esa situación ha dado margen a fricciones y a innumerables problemas persistentes, muy complicados y difíciles de zanjar. Por ejemplo, en Canadá fuertes grupos políticos hablan de hacer dos estados nacionales, uno francés (Quebec) y otro inglés. En Bélgica un grupo minoritario habla de hacer una nueva constitución en la que se reconozcan tres estados distintos formados a base de su distinta composición nacional. Sobre los graves problemas de Irlanda del Norte, del Oriente Medio, de Rhodesia y de Africa del Sur no es necesario elaborar por ser mundialmente conocidos debido a sus trágicas manifestaciones.

Sobre las dificultades que engendra la convivencia forzada de distintas nacionalidades dentro de los límites de un estado político cabe recordar las palabras de una de las mentes más preclaras, si no la más preclara, que ha producido la humanidad. El Profesor Albert Einstein, pacifista y antinacionalista, llegó a las siguientes conclusiones:

"Nationalities . . . seem to have an instinct which prevents them from fusing . . . Nationalities want to pursue their own path, not to

_____

(8) Sobre lo anterior puede verse Hans Kohn, *The Idea of Nationalism* (1941); Hayes, *Essays on Nationalism* (1941); "Nationalism", Vol. XI–XII, *Encyclopaedia of Social Sciences*, 1962, pág. 231 y ss.; sobre la situación actual en Canadá, véase Peter T. White, *One Canada or Two?*, Vol. 151, *National Geographic Magazine*, 1977, pág. 436 y ss., y sobre la situación en Bélgica, James Cerruti, *Belgium, One Nation Divisible*, Vol. 155, *National Geographic Magazine*, 1979, pág. 314 y ss.; Carter and Hertz, *Major Foreign Powers*, 6th ed., (1972); Finner, *The Major Governments of Modern Europe*, 1962, y Shootwell, *Governments of Continental Europe*, Rev. ed., 1952.

blend. A satisfactory state of affairs can be brought about only by mutual toleration and respect.

The first step in that direction is that we ... should once more become conscious of our existence as a nationality and regain the self-respect that is necessary to a healthy existence. We must learn once more to glory in our ancestors and our history and once again take upon ourselves as a nation, cultural tasks of a sort calculated to strengthen our sense of the community. It is not enough for us to play a part as individuals in the cultural development of the human race, we must also tackle tasks which only nations as a whole can perform." Albert Einstein, *The World As I See It,* traducción inglesa de Alan Harris, Philosophical Library, New York, (1949) págs. 100–101.

En el caso de Puerto Rico, cuando la escuadra del Almirante Sampson comenzó el bombardeo de la ciudad de San Juan el 12 de mayo de 1898 [9] ya Puerto Rico era, culturalmente hablando, una nación. Su población, de aproximadamente un millón de habitantes entonces, hablaba uno de los idiomas principales del mundo, el español; profesaba una de las grandes religiones mundiales; compartía también comunes orígenes étnicos y comunes raíces históricas.

Poseía un sistema de derecho maduro, completo y científico, con antecedentes inmediatos españoles y raíces en el derecho civil europeo, comprendiendo este último tanto el derecho codificado como el derecho común civil de origen romano. Comprendía nuestro derecho—además de la Carta Autonómica en el plano constitucional—el Código Civil, el Código de Comercio, la Ley Hipotecaria y su Reglamento, un Código Penal, un Código de Enjuiciamiento Civil, un Código de Enjuiciamiento Penal una Ley de Aguas y una Ley de Minas. Aquel Código Civil ya proveía para los edificios multipisos de diversa propiedad conocidos hoy en Puerto Rico como condominios, cuando en el derecho del país conquistador todavía no se conocía dicho concepto. [9a]

[9] Capt. Angel Rivero, *Crónica de la Guerra Hispano Americana en Puerto Rico,* Río Piedras, Puerto Rico, Ed. Edil, 1972, págs. 67–70.

[9a] Código Civil, Art. 330; 31 L.P.R.A. sec. 1275. Ferrer y Stetcher, *Law of Condominium,* Ed. Equity, 1967.

También existían en el país partidos políticos definidos, se cultivaban las letras y las artes y tenía el país y su Capital la fisonomía cultural definida de la nación puertorriqueña. También para la fecha de la invasión se iniciaba en Puerto Rico un Gobierno Autonómico.

Los azares de la anarquía internacional y de la guerra, troncharon penosamente aquella nueva planta de gobierno propio recién nacida en esta tierra. En páginas que aprietan el alma, tituladas "Intermezzo: Una Nave al Garete" que son parte del tercer capítulo de su libro *Insularismo*, Don Antonio S. Pedreira reflexiona sobre ese acontecimiento. Véase su *Insularismo*, Ed. Biblioteca de Autores Puertorriqueños, 1957, pág. 96 y ss.

Sobre el particular escribió Tomás Blanco:

"Al terminar el siglo, los habitantes de Puerto Rico, casi totalmente agrupados bajo el ideal autonomista, pudieron lograr conciencia de pueblo, de unidad social, por la existencia de problemas locales, propios, por la independencia administrativa y la libre orientación económica para resolver esos problemas que nos otorgaba el acta orgánica del 97, por la personalidad internacional que en asuntos comerciales la Metrópoli nos reconoció al fin; pero, sobre todo, por la parcial fusión de nuestros entronques étnicos y la total convivencia de sus ramas; por la calidad de nuestros mejores hombres representativos, valores propios y al mismo tiempo extra-fronterizos.

En el mismo momento en que ese pueblo se disponía a emprender una nueva etapa de madurez, en armonía con su pasado, sufrió la violencia de un cambio desquiciador, en virtud de una guerra a cuya declaración fuimos ajenos, por el rigor de una derrota a la que no contribuimos, por disposición de un tratado de paz en cuyas negociaciones no tuvimos voz ni voto. Ante la fuerza de las armas y las exigencias exageradas del vencedor, se subyugó nuestra personalidad de pueblo—de provincia autónoma—y pasamos como botín de guerra a ser colonia de una extraña y poderosa nación con la que no teníamos deuda pendiente alguna. En consecuencia, provisionalmente, cesamos, en seguida, en el ejercicio de nuestra autonomía y se nos impuso un gobierno militar 'absoluto y supremo.' "—*Prontua-*

*rio Histórico de Puerto Rico*, 6ta ed., Instituto de Cultura Puertorri-
queña, 1970, págs. 91–92. ([10])

Con lo anterior quiero señalar que para entender adecuada-
mente los problemas que el caso de autos plantea, problemas
de índole jurídica, con su contenido histórico y vital, es
necesario entender y utilizar con precisión los conceptos
antes mencionados.

Así por ejemplo, el Tribunal Supremo de los Estados
Unidos es en lo que a Puerto Rico respecta el Tribunal
Supremo federal pero no nacional. Para un estadounidense
es su Tribunal Supremo nacional, a diferencia de su Tribunal
Supremo estatal. En cuanto a Puerto Rico, nuestro derecho
nacional y nuestro Tribunal Supremo nacional son los de
Puerto Rico y la legislación del Congreso de los Estados
Unidos y la judicatura de los Estados Unidos son federales,
pero no nacionales nuestros. Por eso se habla propiamente
del Comité Olímpico Nacional de Puerto Rico a distinción
del Comité Olímpico Nacional de los Estados Unidos. ([11])

Debe distinguirse, por lo tanto, en Puerto Rico entre la
legislación y la judicatura estadounidense o federal y la
legislación y la judicatura nacional puertorriqueña. Si se
tienen en mente esas diferencias será mucho más fácil el
pensamiento sobre estos problemas. Por el contrario, su
confusión solamente ha de producir más confusión y mayor
dificultad al tratar tan complejos asuntos.

---

([10]) Véase, además, Carmelo Delgado Cintrón, *La Transculturación del Pensa-
miento Jurídico de Puerto Rico*, 45 Rev. Jur. U.P.R. 305 (1976) y del mismo autor,
*Historia del Derecho Puertorriqueño*, 31 Rev. C. Abo. P.R., 157 y 283 (1970); Eulalio
A. Torres, *The Puerto Rico Penal Code of 1902–1965: A Case Study of American Legal
Imperialism*, 45 Rev. Jur. U.P.R. 1 (1976); Manuel Rodríguez Ramos, *Breve Historia
de los Códigos de Puerto Rico*, 19 Rev. Jur. U.P.R. 233 (1949–50); Luis Muñoz
Morales, *Reseña Histórica y Anotaciones al Código Civil de Puerto Rico*—Libro I,
(1947) y José Ramón Vélez Torres, *La Presencia de los Sistemas de Derecho Civil y de
Derecho Anglosajón en la Jurisprudencia Puertorriqueña*, 11 Rev. Jur. U.I.A. 805
(1977).

([11]) Raúl Serrano Geyls y Carlos Gorrín Peralta, *Puerto Rico y la Estadidad,
Problemas Constitucionales*, 41 Rev. C. P.R. Abo. 1, 17–20 (1980).