PARTIDO NUEVO PROGRESISTA (P.N.P.), representado por su Comisionado, HON. FRANCISCO GONZÁLEZ, JR., peticionario y apelante, *v.* HON. MARCOS A. RODRÍGUEZ ESTRADA, en su condición de PRESIDENTE DE LA COMISIÓN ESTATAL DE ELECCIONES, demandado y apelado, y en representación del Partido Popular Democrático (P.P.D.), interventor; PARTIDO INDEPENDENTISTA PUERTORRIQUEÑO (P.I.P.), representado por su Comisionado, HON. HIRAM A. MELÉNDEZ RIVERA, peticionario y apelante, *v.* HON. MARCOS A. RODRÍGUEZ ESTRADA, en su condición de PRESIDENTE DE LA COMISIÓN ESTATAL DE ELECCIONES, demandado y apelado.

*Números:* AC-88-571 *Resueltos:* 21 de octubre de 1988
AC-88-593

*Miguel Pagán* y *Eliezer Aldarondo Ortiz,* abogados del apelante Partido Nuevo Progresista; *David Rivé Rivera,* abogado del Hon. Marcos A. Rodríguez Estrada, Presidente de la Comisión Estatal de Elecciones, apelado; *Eudaldo Báez Galib,* abogado del Partido Popular Democrático, interventor; *Fernando Colón Serbiá,* abogado del apelante Partido Independentista Puertorriqueño.

EL JUEZ PRESIDENTE SEÑOR PONS NÚÑEZ emitió la opinión del Tribunal.

El pasado viernes 14 de octubre de 1988, el Tribunal decidió asumir jurisdicción sobre la apelación presentada en este asunto por el Partido Nuevo Progresista (P.N.P.). Al así hacerlo, determinó

. . . concede[r] al Presidente de la Comisión Estatal de Elecciones hasta las doce del mediodía del martes 18 de octubre de 1988, para mostrar causa, por la cual no deba accederse al planteamiento del apelante Comisionado Electoral del Partido Nuevo Progresista en torno a la determinación del 1ro. de octubre de 1988 en cuanto a su propuesta de esa fecha según la misma fuera modificada a solicitud del Comisionado Electoral del Partido Independentista Puertorriqueño.

En su comparecencia debe el Presidente de la Comisión Estatal de Elecciones tratar particularmente la cuestión relativa a su facultad de votar en este asunto, y debe ilustrar a este Tribunal sobre la razón y efecto del acuerdo posterior adoptado por unanimidad, el día 6 de octubre de 1988.

Dentro del término aquí concedido al Presidente de la Comisión Estatal de Elecciones los señores Comisionados Electorales podrán exponer lo que tengan a bien en relación con este asunto. Caso Núm. AC-88-571, Resolución de 14 de octubre de 1988.

El lunes 17 de octubre de 1988, el Partido Independentista Puertorriqueño (P.I.P.) también presentó un escrito de apelación sobre el mismo asunto. Ese día el Tribunal acogió el recurso y decidió que se habría de

... tramitar conjuntamente y consolidado con la apelación presentada en el caso AC-88-571 *Partido Nuevo Progresista (PNP) presentado por su Comisionado, Hon. Francisco González, Jr.,* peticionario-apelante vs. *Hon. Marcos Rodríguez Estrada, Presidente de la Comisión Estatal de Elecciones,* demandados-apelados. Caso Núm. AC-88-593, Resolución de 17 de octubre de 1988.

Las partes han comparecido y presentado los escritos que estiman pertinentes para ilustrar al Tribunal.

I

La controversia inicial ante nos versa, esencialmente, sobre la facultad del Presidente de la Comisión Estatal de Elecciones (C.E.E.) para votar en relación con enmiendas al Reglamento Oficial para las Elecciones Generales, propuestas por los partidos políticos dentro de los cuatro (4) meses anteriores a las elecciones, pero con anterioridad al último mes, y adoptadas por los votos de la mayoría de los Comisionados Electorales que los representan ante la C.E.E.

Adicionalmente se nos plantea —en la alternativa de que este Tribunal invalide el voto del Presidente de la C.E.E.—

la legalidad y viabilidad de la enmienda propuesta a dicho reglamento.

Resultan propios para la solución de la controversia, en lo pertinente, las siguientes disposiciones de la vigente Ley Electoral de Puerto Rico.

Art. 1.004 (16 L.P.R.A. sec. 3004):

*Comisión Estatal de Elecciones*

Se crea una Comisión Estatal de Elecciones, la cual estará integrada por un Presidente, quien será su Oficial Ejecutivo, y un Comisionado Electoral en representación de cada uno de los partidos políticos principales, por petición o coligados.

La sede y oficinas centrales de la Comisión estarán ubicadas en la ciudad de San Juan de Puerto Rico.

Serán miembros de la Comisión con voz, pero sin voto y no contarán para el quórum, un Primer y un Segundo Vicepresidente, cuyas prerrogativas y funciones serán establecidas por este Subtítulo y sus reglamentos, específicamente por las disposiciones contenidas en la sec. 3007 de este título.

Art. 1.005 (16 L.P.R.A. sec. 3013):

*Funciones, deberes y facultades de la Comisión*

La Comisión Estatal de Elecciones será el [*sic*] responsable de planificar, organizar, estructurar, dirigir y supervisar el organismo electoral y todos los procedimientos de naturaleza electoral que, conforme este Subtítulo y sus reglamentos, rijan en cualquier elección a celebrarse en Puerto Rico. En el desempeño de tal función, tendrá, en adición a cualesquiera otros dispuestos en este Subtítulo, los siguientes deberes:

. . . . . . . .

(*l*) Aprobar y adoptar las reglas y reglamentos que fueren necesarios para implementar las disposiciones de este Subtítulo bajo su jurisdicción, los cuales tendrán vigencia, previa notificación al Gobernador y a la Asamblea Legislativa de Puerto Rico, mediante publicación al efecto en dos (2) periódicos de circulación general, dos (2) veces en un lapso de dos (2) semanas, sin que sea necesario el cumplimiento de las disposiciones de las secs. 1041 a 1059 del Título 3, conocidas como "Ley sobre Reglamentos de 1958".

A tales efectos la Comisión deberá adoptar el reglamento para las elecciones y el escrutinio general con por lo menos cuatro (4) meses de anticipación. Dicho reglamento incluirá, entre otras cosas, las estructuras y funcionamiento de los colegios electorales, las Juntas de Unidad Electoral, las comisiones locales y la Comisión Estatal de Elecciones, durante el período eleccionario y post-eleccionario, así como, el proceso de votación y escrutinio incluido, el del voto ausente y las disposiciones relativas al escrutinio general. Cualquier enmienda a dicho reglamento o a los procedimientos que allí se consignan, que se adopten dentro de los cuatro meses antes de las elecciones, serán adoptadas por mayoría de votos en la Comisión. Disponiéndose que cualquier enmienda durante el último mes antes de las elecciones o durante el día de las elecciones, y hasta que finalice el escrutinio, se hará por unanimidad de votos en la Comisión. Toda reglamentación que se adopte por la Comisión durante los últimos cuatro (4) meses antes de las elecciones, podrá ser apelada directamente al Tribunal Supremo de Puerto Rico.

## Art. 1.006 (16 L.P.R.A. sec. 3014):

*Reuniones de la Comisión*

. . . . . . . .

(e) Todo acuerdo de la Comisión Estatal de Elecciones deberá ser aprobado por unanimidad de los votos de los Comisionados presentes al momento de efectuarse la votación. Cualquier cuestión sometida a la consideración de dicha Comisión que no recibiere tal unanimidad de votos será decidida, en pro o en contra por el Presidente cuya decisión se considerará como la decisión de la Comisión Estatal de Elecciones y podrá apelarse en la forma provista en este Subtítulo.

## Art. 5.031 (16 L.P.R.A. sec. 3234):

*Recusación de un elector*

Todo elector o inspector que tuviere motivos fundados para creer que una persona que se presente a votar lo hace ilegalmente por razón de no ser la persona que dice ser, haber votado en otro colegio, estar inscrito en más de un colegio, tener una orden de exclusión en su contra, estar pendiente de adju-

dicación su derecho a votar en ese precinto, no ser ciudadano de los Estados Unidos de América y no tener la edad para votar, podrá recusar su voto por los motivos que lo hicieren ilegal a virtud de las disposiciones de este Subtítulo, pero dicha recusación no impedirá que el elector emita su voto. En el caso de recusación por edad, será deber del recusador traer consigo, y entregar a la Junta de Colegio, un certificado de nacimiento o acta negativa que indique la ausencia de edad para votar de dicho elector.

## II

El sábado 1ro de octubre de 1988 la C.E.E. consideró una propuesta del Comisionado Electoral del P.N.P., Francisco González, Jr., para enmendar el Reglamento Oficial para las Elecciones Generales y "establecer un procedimiento especial mediante el cual se permita votar el día de las elecciones a los electores que aleguen y presenten evidencia de tener derecho a estar en las listas y no aparezcan". Caso Núm. AC-88-593, Apéndice, págs. 1–2.

Dicha propuesta vislumbra que:

"Se autorice el voto de electores debidamente identificados con su Tarjeta de Identificación Electoral que hayan comparecido a una unidad, insistiendo éstos en que son electores de la misma a pesar de que su nombre y demás circunstancias no aparecen en la lista alfa-precintal o en la lista alfa-unidad.

En estos casos el elector tendría que firmar una lista de votación especial en el colegio al cual sea asignado a votar, la cual posee una advertencia para todos los electores cuyos nombres y demás circunstancias son vaciados en ella. Véase Anejo I. Esta información alerta al elector, cuyos datos se han añadido a mano en esta lista sobre el delito que estarían cometiendo de estar votando ilegalmente. El elector en cuestión se identificará en el colegio que se le asigne ante la Junta de Colegio y seguirá el siguiente procedimiento:

a) Verificarán con la lámpara para ver si está entintado.

b) Se añadirá su nombre a la lista previamente diseñada a esos fines.

c) Procederá a entregar su Tarjeta de Identificación Electoral, la cual será perforada y retenida por la Junta de

Colegio; procediendo ésta a depositar dicha tarjeta, posteriormente, en un sobre especial para esos fines. Una vez hecho ésto, se le entregarán al elector las dos (2) papeletas y pasará a la caseta de votación para ejercer su derecho al voto.

d) Antes de depositar su voto en la urna, el elector entregará a los inspectores propietarios las papeletas. Estos procederán a depositarlas en un sobre previamente impreso el cual contendrá en su faz una serie de espacios donde se vaciará la información personal del elector. Una vez hecho ésto, el sobre será depositado en la urna y el elector podrá abandonar el centro de votación.

Al momento del escrutinio estos votos específicamente, se darán por no adjudicados dejando los mismos para ser verificados en cualquiera de las formas siguientes:

1. Una vez cuadrado el colegio, estos sobres podrían dejarse fuera del maletín y ser entregados mediante recibo a la Junta de Unidad, quien una vez finalice sus trabajos llevarán éstos a la Junta de Precinto, pudiendo ser revisada la información del elector por dicha Junta, a través del terminal de la computadora que posee o a través de los documentos de trabajo allí existentes, tales como:

a) Microfichas

b) Listados de Electores

c) Copia de transacciones del cuatrienio

De aparecer la información del elector, indicando que éste tenía derecho a votar en esa unidad, se procederá a validar el sobre por todos los comisionados allí presentes y adjudicar el voto finalmente. En caso de que el elector apareciera votando en otro precinto o unidad, entonces la Junta de Precinto no adjudicará el voto y anotará en el sobre los datos del precinto y la unidad, donde supuestamente este elector le correspondía votar. En estos casos estos votos serán enviados a la atención de la C.E.E. para que proceda a adjudicarlos finalmente una vez se comience el escrutinio final y/o recuento". Caso Núm. AC-88-593, Apéndice, págs. 27–28.

Planteada la cuestión ante la C.E.E., en dicha reunión el Comisionado Electoral del P.I.P., Hiram A. Meléndez Rivera, recomendó la adopción de medidas adicionales "'que tiendan a proteger al elector, que como consecuencia de al-

gún error atribuible al organismo electoral al momento de ir a votar no se encuentre en las listas electorales'". Caso Núm. AC-88-593, Apéndice, pág. 2. A esos efectos propuso que:

". . . [C]uando un elector alegue y presente su Tarjeta de Identificación Electoral, que ha sido excluido de las listas electorales de su precinto por causa atribuible al organismo electoral y reclame su derecho de estar debidamente registrado para fines de votar, la Subjunta le expedirá un boleto [que le] autori[zará] a ir al último colegio de votación. Dicho boleto tendrá una leyenda que disponga que el elector cuyo nombre, apellido y número electoral que se identifica en el boleto ha sido autorizado a votar añadido en la lista de dicho último colegio. Una vez en dicho colegio, el elector se añadirá al final de la lista de dicho colegio y se le pondrán todos los datos personales y electorales que le identifiquen claramente, tales como nombre, número electoral, nombre del padre, nombre de la madre y dirección residencial. Se le entregará la papeleta de votación, se le entintará como corresponde a todo votante y antes de depositar su voto será recusado. Dicha recusación tendrá que ser contradeclarada mediante la firma bajo juramento, siguiendo el procedimiento de recusació[n] de una declaración jurada en la cual el elector explica: (1) que es un elector con derecho a votar y (2) que su nombre ha sido excluido de las listas electorales por error atribuible a organismo electoral y (3) que el elector no ha votado durante el período de votación, el cual entendemos comienza desde el domingo antes, ni por medio del voto adelantado, ni por medio de voto ausente ni de ninguna otra forma en ningún colegio electoral en la Isla de Puerto Rico, [en lo] referente a la elección de los cargos electivos del 8 de noviembre de 1988.
[Dicha declaración jurada se incorporará a los materiales pertinentes del colegio, junto a la papeleta electoral así recusad[a] . . . y dicho voto no se adjudicará en el colegio electoral y se enviará al proceso de escrutinio general.]"[1] Caso Núm. AC-88-593, Apéndice, págs. 28–29.

---

[1] Aun cuando en la transcripción que hace el Presidente de la C.E.E. en su resolución, y el apelante P.N.P. en su recurso, no aparece este último párrafo, surge de la transcripción de las incidencias de dicha reunión que el mismo es

Después de deliberar sobre el asunto, el Comisionado Electoral del P.N.P. aceptó la propuesta del comisionado Meléndez y atemperó su recomendación a la misma. Llevado el asunto a votación, los Comisionados Electorales del P.N.P. y del P.I.P. emitieron votos a favor, y el del Partido Popular Democrático (P.P.D.) en contra.

Ante esa votación, el Presidente de la C.E.E. planteó que se requería unanimidad para adoptar las enmiendas propuestas, pues se encontraban dentro del último mes antes de las elecciones. Su posición fue refutada por los favorecedores de la propuesta y respaldada por el opositor. Después de una breve discusión, en que también se planteó la validez del acuerdo por mayoría, los comisionados González y Meléndez abandonaron la reunión.

El 6 de octubre de 1988 la C.E.E. adoptó una resolución con el fin de "permitir que los electores que no aparezcan en las listas oficiales de votación, principal y suplementaria[,] que reclamen su derecho durante el período comprendido entre el 20 de septiembre [y el] 4 de noviembre y así quede constatado, puedan figurar en las listas de inclusión para que ejerzan su derecho al voto el 8 de noviembre". Caso Núm. AC-88-593, Apéndice, pág. 31.

Al siguiente día, 7 de octubre de 1988, el Presidente de la C.E.E., mediante resolución, abandonó su planteamiento inicial sobre unanimidad y emitió un voto en contra de la propuesta de 1ro de octubre del P.N.P., según quedó modificada por el P.I.P. Señaló el Presidente de la C.E.E. en su resolución que el efecto de su voto era derrotar la propuesta del P.N.P., pues al unir su voto al del P.P.D. ya ésta no cuenta con una "mayoría de votos en la Comisión".

---

parte integral del planteamiento hecho por el comisionado Meléndez. Caso Núm. AC-88-593, Apéndice, págs. 4–5.

## III

■ Son reglas básicas de hermenéutica legal que las leyes deben interpretarse considerando su "razón y espíritu", Art. 19 del Código Civil, 31 L.P.R.A. sec. 19, y examinando y comparando "sus partes, de suerte que sean hechas consistentes y tengan efecto. Para ello, deben interpretarse las diferentes secciones, las unas en relación con las otras, completando o supliendo lo que falte o sea oscuro en una con lo dispuesto en la otra, procurando siempre dar cumplimiento al propósito del legislador". R. Bernier y J.A. Cuevas Segarra, *Aprobación e interpretación de las leyes en Puerto Rico*, 2da ed., San Juan, Pubs. J.T.S., 1987, Vol. I, pág. 315, y jurisprudencia allí citada.

■ El esquema de nuestro ordenamiento electoral tiene como premisa fundamental, en cuanto a la dirección del proceso, un "sistema de participación y balance por los partidos . . .". Informe de la Comisión Especial para la Revisión del Proceso Electoral de Puerto Rico, 17 de mayo de 1982, pág. 13. (En adelante Informe de la C.E.R.P.E.) De hecho, el espíritu que permea el informe de la C.E.R.P.E. aludido, que sirve de fundamento a la reforma electoral de 1983, es conferir a los partidos políticos el control del proceso electoral y que el Presidente de la C.E.E., organismo rector, sea principalmente un oficial ejecutivo a cargo de implantar los acuerdos de los partidos y tenga la capacidad para decidir *cuándo los partidos no puedan hacerlo*. Ese mismo espíritu se recoge en el Informe al Senado de Puerto Rico de su Comisión de Gobierno. XXXVI (Núm. 14) Diario de Sesiones de la Asamblea Legislativa (Senado), 254 (1982). No arroja más luz dicho informe de la C.E.R.P.E. en cuanto al particular problema que aquí enfrentamos. Tampoco hemos encontrado en el correspondiente Diario de Sesiones de la Asamblea Legislativa (Senado) referencia al mismo; sólo una mera repeti-

ción de lo dispuesto en el estatuto. Es a la luz de esa realidad que debemos analizar el estatuto que nos concierne utilizando en el proceso las reglas de hermenéutica antes aludidas.

■ El Art. 1.004 de la Ley Electoral de Puerto Rico, *supra, inter alia*, crea la C.E.E. y dispone que han de ser sus integrantes "un Presidente, quien será su Oficial Ejecutivo, y un Comisionado Electoral en representación de cada uno de los partidos políticos principales" y, por eliminación, al señalar quiénes tienen voz pero no voto, establece implícitamente que el Presidente de la C.E.E. y los Comisionados Electorales tienen derecho a votar.

■ El Art. 1.006 de la Ley Electoral de Puerto Rico, *supra*, establece la regla general sobre cómo se aprobarán *todos los acuerdos de la C.E.E.* y en qué circunstancias sus integrantes pueden ejercer su derecho al voto. Indica que los acuerdos serán aprobados por unanimidad *de los votos de los comisionados* presentes al momento de efectuarse la votación. Dispone que el Presidente de la C.E.E. votará *sólo cuando los partidos*, por conducto de sus comisionados, *no puedan resolver el asunto* por razón de no lograrse los votos requeridos. Ello es cónsono con el espíritu de control primario por los partidos que permea todo el esquema. Pero, ¿qué sucede cuando nos enfrentamos al Art. 1.005 de dicha ley, *supra*? Sencillamente, a través del mismo se reconoce una excepción a la regla general y se establece que las enmiendas al reglamento para las elecciones y el escrutinio general que se adopten dentro de los cuatro (4) meses anteriores a las elecciones, pero antes del último mes, tienen que contar con una mayoría, en lugar de unanimidad, de votos en la C.E.E. ¿Los votos de quiénes en la C.E.E.? No se indica que sean de *todos los integrantes* de la C.E.E. Tampoco se indica, como en el Art. 1.006, *supra*, que sea de los *comisionados pre-*

*sentes.* Ante tal interrogante y en vista del silencio del legislador, nos corresponde suplir la contestación a la luz de las reglas de hermenéutica antes apuntadas. Lo hacemos resolviendo, acorde con el espíritu que informa la ley y con la regla general que ésta establece en su Art. 1.006, *supra,* que sean los Comisionados Electorales en representación de sus respectivos partidos los que, en este caso por mayoría, adopten las enmiendas al reglamento. Como existe esa mayoría y, por tanto, los partidos pueden resolver el asunto, no hay razón para que el Presidente de la C.E.E. ejerza su derecho a votar por excepción y trascienda el rol primario de ejecutivo, administrador, que la Ley Electoral de Puerto Rico le atribuye. No nos toca decidir hoy si tiene derecho el Presidente de la C.E.E. a votar en caso de empate, lo cual puede ocurrir cuando sean dos (2) o cuatro (4) los partidos representados en la C.E.E., pues los hechos ante nos no lo plantean y, además, resulta ya académico pues nos encontramos dentro del último mes antes de las elecciones. Es, sin embargo, interesante notar que en 1984, poco más de un año después de aprobarse en 1983 la legislación que hoy interpretamos, fueron cuatro (4) los partidos representados en la C.E.E.: el P.N.P., el P.P.D., el P.I.P. y el Partido de Renovación Puertorriqueña (P.R.P.).

## IV

Determinada la validez del método usado para la adopción de la propuesta de 1ro de octubre de 1988, nos resta determinar la legalidad del procedimiento en ella estipulado y la viabilidad práctica del mismo.

El señalamiento que a primera vista parecería tener más validez, no nos convence. Argumenta el Comisionado Electoral del P.P.D. que la recusación del elector es necesaria para poder implantar el acuerdo de referencia, que las causales de recusación están taxativamente provistas por el Art. 5.031 de la Ley Electoral de Puerto Rico, *supra,* y que la causa en

este caso es "no estar en las listas y poseer una T.I.E." (tarjeta de identificación electoral), en cuanto a la cual nada dispone dicho Art. 5.031.

Nótese que la propuesta, según enmendada por el comisionado Meléndez, dispone que el "voto no se adjudicará en el colegio electoral" y que una de las causales de recusación que establece el Art. 5.031 de la Ley Electoral de Puerto Rico, *supra*, es "estar pendiente de adjudicación su derecho [el del elector] a votar en ese precinto . . .". No es, pues, la causal de recusación la apuntada por el comisionado del P.P.D., sino la que se establece en el Art. 5.031, *supra*, puesto que el resultado del procedimiento aprobado es dejar pendiente de adjudicación el derecho del elector a votar en ese precinto.

Se aduce también que el procedimiento adoptado priva a los ciudadanos del derecho a recusar al elector por otras causales. No tiene tal consecuencia ese procedimiento. Adviértase que la única razón por la cual se puede invocar el mismo es que el nombre del elector no aparezca en las listas electorales "por error atribuible al organismo electoral" —Caso Núm. AC-88-571, Apéndice, pág. 12— y que, además, mediante la declaración jurada que se le exige, en efecto, el elector tiene que acreditar su capacidad para votar en el lugar en que pretende hacerlo. Si acredita esa capacidad mediante la declaración jurada, no existiría otra causal de recusación de que se esté privando a los ciudadanos.

Con referencia a los argumentos esgrimidos sobre la obligación de los electores de ser diligentes y constatar dentro de un término prudente su *status* electoral, y los argumentos afincados en supuestas barreras u obstáculos de carácter técnico-burocrático, también sostenemos que no son persuasivos.

 La responsabilidad primaria de garantizar a los electores que se ha de "contar cada voto en la forma y ma-

nera en que sea emitido" recae sobre la C.E.E. Art. 1.002 de la Ley Electoral de Puerto Rico, 16 L.P.R.A. sec. 3002. El trámite administrativo no debe ser obstáculo o barrera que impida a un elector el libre ejercicio del sufragio. Corresponde a los organismos del Estado hacer lo más viable posible el ejercicio del sufragio, fundamento esencial de la democracia, y no puede ni debe éste rehuir esa responsabilidad mediante el traslado de parte de la misma al elector. Si se pueden proveer los mecanismos para que aun los electores que no actúen con diligencia puedan votar, existe el deber de proveerlos, siempre y cuando la C.E.E. provea las garantías necesarias para evitar que se conculque la integridad del proceso electoral. Mediante el mecanismo adoptado, a nuestro juicio, se cumple a cabalidad con esa obligación y se proveen las garantías necesarias para mantener la integridad del proceso electoral.

■ Las especulaciones sobre posibles problemas de trámite técnico-burocrático no pueden ser razón para no allanar al máximo el camino para que todos los ciudadanos, que puedan hacerlo, voten. Si se han previsto ya los posibles problemas de esa naturaleza, la responsabilidad que pesa sobre la C.E.E. requiere que ésta tome las medidas necesarias para solucionarlos. Esa es su misión y su función.

Nada se aduce que justifique preocupación por la integridad del proceso. De hecho, los señalamientos referentes al estado actual de preparación de la C.E.E. para supervisar el proceso electoral y la experiencia histórica con relación a hacer viable el voto el día de las elecciones a aquellos que por razones ajenas a su voluntad habían sido excluidos del proceso electoral, avalan la deseabilidad de que se continúe concediendo esa oportunidad.

## V

Una última consideración referente al acuerdo de 6 de octubre de 1988. El mismo dispuso que electores que no aparezcan en las listas electorales pueden gestionar su inclusión en dichas listas durante el período comprendido entre el 20 de septiembre al 4 de noviembre de 1988. Por la información suministrada en la comparecencia de las partes, entendemos que el mecanismo que se provee mediante ese acuerdo es valioso y adecuado para lograr el objetivo de hacer lo más viable posible el sufragio. En ese sentido, ese mecanismo y el provisto por el acuerdo de 1ro de octubre de 1988 se complementan entre sí y proveen instrumentos adecuados para lograr el objetivo aludido.

*Se dicta sentencia y se deja sin efecto la resolución apelada emitida por el Presidente de la C.E.E., Lcdo. Marcos A. Rodríguez Estrada, el 7 de octubre de 1988. Se le ordena al licenciado Rodríguez Estrada que ponga en vigor la enmienda de la Regla 34(c) del Reglamento Oficial para las Elecciones Generales según la misma fue propuesta por el Comisionado Electoral del P.N.P., Sr. Francisco González, Jr., y enmendada a solicitud del Comisionado Electoral del P.I.P., Lcdo. Hiram A. Meléndez Rivera, y así adoptada por la mayoría de votos de los Comisionados Electorales en la reunión de la C.E.E., celebrada el 1ro de octubre de 1988.*

El Juez Asociado Señor Negrón García emitió opinión concurrente. El Juez Asociado Señor Rebollo López concurre con el resultado sin opinión escrita. El Juez Asociado Señor Ortiz emitió opinión concurrente y disidente.

—O—

Opinión concurrente del Juez Asociado Señor Negrón García.

"[L]a función electoral es entendida como el conjunto de actividades y sus consecuentes normas en el proceso de escoger y vigilar los miembros del cuerpo representativo; o, dicho de un modo algo más abstracto: el medio por el cual un pueblo reintegra su propósito colectivo por medio de la selección· de representantes suyos encargados de conducir los procesos públicos. Se supone que las leyes y costumbres de un país (como su constitución misma) contribuyan a lograr estos objetivos de una manera más fiel; si así ocurre habríamos de esperar que, cumplida esta función primera, las restantes funciones de poder (a saber: legislativa, ejecutiva y judicial) revelen cualidades auténticamente democráticas." A. Sánchez Tarniella, *Significados*, Madrid, Ed. Afrodisio Aguado, 1972, pág. 70.

I

*"Toda reglamentación [para las elecciones y el escrutinio general] que se adopte por la Comisión durante los últimos cuatro (4) meses antes de las elecciones, podrá ser apelada directamente al Tribunal Supremo de Puerto Rico."* (Énfasis suplido.) Art. 1.005 de la Ley Electoral de Puerto Rico, 16 L.P.R.A. sec. 3013(*l*). A su amparo, comparecen separadamente el Partido Nuevo Progresista (P.N.P.) y el Partido Independentista Puertorriqueño (P.I.P.) —representados respectivamente por sus Comisionados Electorales, Sr. Francisco González, Jr. y el Lcdo. Hiram A. Meléndez Rivera— y nos solicitan el ejercicio directo de nuestra jurisdicción apelativa en torno a la vigencia y validez de una enmienda al Reglamento de Votación y Escrutinio, propuesta por el primero, según secundada y modificada por el Comisionado Electoral del P.I.P. el 1ro de octubre de 1988. Dicha enmienda fue objetada por el Comisionado Electoral del Partido Popular Democrático (P.P.D.), Lcdo. Eudaldo Báez Galib. No ha sido puesta en vigor por la negativa del Presidente de la Comisión Estatal de Elecciones, Lcdo.

Marcos A. Rodríguez Estrada, apoyada en los fundamentos de su Resolución de 7 de octubre de 1988.

Acogemos los reclamos del P.N.P. y del P.I.P. No cabe la menor duda de que concurren las condiciones procesales previstas en la transcrita disposición de ley para que intervengamos en ambas apelaciones. Tenemos el beneficio de los escritos de todas las partes. La urgencia del asunto —a pocos días de las elecciones— requiere la más pronta adjudicación.

## II

La Ley Electoral de Puerto Rico aprobada en 1977, según enmendada, estableció la Comisión Estatal de Elecciones (C.E.E.) como organismo rector con la encomienda de planificar, organizar, estructurar, dirigir y supervisar el organismo electoral, y todo procedimiento de igual naturaleza. Está integrado, con voz y voto, por un Presidente —oficial ejecutivo a cargo de implantar los acuerdos— y un Comisionado Electoral en representación de cada uno de los partidos políticos principales, por petición o coligados. Art. 1.005 de la Ley Electoral de Puerto Rico, *supra*. El Presidente de la C.E.E. y su alterno pertenecerán al partido político cuyo candidato a gobernador obtuvo el mayor número de votos en las elecciones inmediatamente precedentes. Art. 1.009 (16 L.P.R.A. sec. 3005). En la ordenación de las labores y deliberaciones de la C.E.E. para efectos de sus acuerdos, el número de miembros necesarios para quórum será el "Presidente y dos (2) Comisionados . . .". Art. 1.006 (16 L.P.R.A. sec. 3014). Según este mismo artículo, "[t]odo acuerdo de la Comisión Estatal de Elecciones deberá ser aprobado por *unanimidad* de los votos de los Comisionados *presentes* al momento de efectuarse la votación. Cualquier cuestión sometida a la consideración de dicha Comisión que no recibiere tal unanimidad de votos será decidida, en pro o en contra por el Presidente cuya decisión se considerará como la decisión

de la Comisión Estatal de Elecciones y podrá apelarse en la forma provista en este Subtítulo". (Énfasis suplido.) 16 L.P.R.A. sec. 3014(e).

Se observa, pues, que este peculiar método de votación remite inicialmente a los comisionados la decisión a base de la regla de *unanimidad*. Si la hay, el Presidente de la C.E.E. no interviene. Advertimos, sin embargo, que ese acuerdo al unísono no tiene que ser necesariamente producto de *todos* los comisionados. La ley dispone que puede ser el resultado de "los votos de los Comisionados *presentes* al momento de efectuarse la votación". (Énfasis suplido.) 16 L.P.R.A. sec. 3014(e). Dicho de otro modo, bajo este esquema decisorio, la unanimidad no se proyecta como una regla *absoluta*, sino de unanimidad *relativa*. Ante una convocatoria válida y la ausencia de uno de los comisionados —de haber quórum— puede legítimamente producirse el acuerdo.

En *P.S.P. v. Com. Estatal de Elecciones*, 110 D.P.R. 400 (1980), sostuvimos la constitucionalidad de este método. Allí evaluamos, *in extenso*, su espíritu y alcance:

> La fórmula y mecánica de votación prescrita en la ley *remite inicialmente* las decisiones de la Comisión al criterio *unánime* de los votos de los Comisionados Electorales presentes. De no mediar tal unanimidad, la cuestión *"será decidida,* en pro o en contra por el Administrador [ahora Presidente] . . . *cuya decisión* se considerará como la decisión de la Comisión" y podrá apelarse. (Bastardillas nuestras.) Art. 1.014(e), 16 L.P.R.A. sec. 3014(e). . . . Fácil es advertir la extensa facultad y delicada responsabilidad que recae sobre los hombros del Administrador General como *única* figura clave representativa del interés público en la Comisión. La importancia de que decida con recta ecuanimidad, imparcialidad y juridicidad se acentúa por el ambiente inherentemente político en que se asumen y adoptan posiciones sobre algunas cuestiones de importancia e impacto partidista, y en las cuales resulta natural e inevitable que el voto individual de los Comisionados responda exclusivamente a razones y consideraciones de ventajas partidistas.

El método decisional resiste el ataque de inconstitucionalidad. Nos explicamos. Al describir previamente la filosofía y estructura de la Comisión Estatal de Elecciones, destacamos que sus integrantes son los representantes de los distintos partidos políticos. Tal composición parte del supuesto de que esos Comisionados Electorales se fiscalizarán recíprocamente y, como resultado, se lograrán unas elecciones justas, limpias y ordenadas. También hemos señalado que las únicas limitaciones que pesan sobre un acuerdo unánime de los Comisionados Electorales son las dimanantes de la Constitución, o de la Ley, *o de un reglamento previamente aprobado.* Incuestionablemente, la concepción legislativa en la mecánica de votación tiene sus virtudes al igual que defectos. *Teóricamente propicia que los partidos políticos, como contendientes institucionales primarios, para beneficio de sus seguidores —y, por ende, de todos los electores— establezcan por mutuo acuerdo, en igualdad de condiciones, las normas y reglamentos requeridos para todo evento electoral.* A su vez, ello tiende a evitar planteamientos de sorpresa, cambios posteriores para obtener ventajas, asegurando la estabilidad, certeza y pulcritud comicial. Por otro lado, se pueden agudizar y perpetuar *ad infinitum* las discrepancias entre tales partidos, sean originadas en el seno de la Comisión o transportadas de afuera hacia adentro. En esta última situación es que se evidencia la razonabilidad de la ley.

Al examinar detenidamente el marco conceptual que inspira el estatuto, vemos que la mecánica decisional de la Comisión se compone de dos etapas. La *primera,* que las cuestiones y las decisiones de la Comisión corresponde inicialmente dilucidarlas y adoptarlas a los Comisionados Electorales, por votación unánime. La ley favorece y estimula tales acuerdos. Así, si hay unanimidad, el acuerdo institucional y colegiado es la decisión válida de la Comisión y sólo resta implementarlo. *En esa etapa, solamente los Comisionados votan sin que intervenga el Administrador.* Ahora bien, si no existe tal unanimidad, legalmente no hay decisión y se pone en movimiento la *segunda* etapa. Para ésta, la ley entonces contempla y confiere al Administrador la facultad de decidir. *Esa decisión no es propiamente hablando un simple voto adicional que se suma*

*matemáticamente a los de algunos Comisionados, sino la decisión institucional, ipso jure,* de la Comisión. La ley les dio la oportunidad a los Comisionados de decidir y, al no poder hacerlo por unanimidad, no se materializa ni existe decisión. Cesa ahí el poder de los Comisionados. Entonces se otorga al Administrador la prerrogativa de decidir exclusivamente la cual se produce con efecto institucional. Notamos, pues, que en su sentido más preciso, no podemos estrictamente hablar de un sistema de votación en que se vulnera la regla de la mayoría. El desenvolvimiento de la ley opera en dos etapas definidas y no por votación mayoritaria. Pudo muy bien la Asamblea Legislativa conceder poderes de decisión en toda etapa exclusivamente al Administrador, ciñendo la ingerencia de los partidos políticos a simples órganos de consulta, y ello no vulneraría la Constitución. (Escolio omitido, énfasis suplido y en el original.) *P.S.P. v. Com. Estatal de Elecciones,* supra, págs. 408–413.

Estos pronunciamientos son importantes para entender la disposición de estos recursos. Al tenerlos presentes evitamos toda posible confusión. Nos explicamos. Después de las elecciones de 1980 la Asamblea Legislativa, mediante la Resolución Conjunta Núm. 21 de 21 de julio de 1981, creó la Comisión Especial de Revisión del Proceso Electoral (C.E.R.P.E.). Su génesis "respondió al clamor público de que se realizara una revisión del proceso electoral, que estaba ampliamente justificada por las experiencias que vivimos durante el período eleccionario de 1980. [É]ste se vio perturbado por una etapa preparatoria saturada de problemas, acusaciones y desorganización, por un día de elecciones lleno de confusión, incertidumbre y malestar, y por un final agitado por la lentitud del recuento de votos y complicado por una inmensa cantidad de conflictos muchos de los cuales tuvieron que ser resueltos por los tribunales. [Véanse: *P.S.P. v. C.E.E.,* 110 D.P.R. 400 (1980); *P.P.D. v. Barreto Pérez,* 110 D.P.R. 376 (1980); *P.S.P., P.P.D., P.I.P. v. Romero Barceló,* 110 D.P.R. 248 (1980); *Díaz v. Srio. Cám. de Representantes,* 110 D.P.R. 547 (1980); *Esteves v. Srio. Cám. de Represen-*

*tantes*, 110 D.P.R. 585 (1981); *Zayas Green v. Barreto Pérez*, 110 D.P.R. 598 (1981); *P.P.D. v. Admor. Gen. de Elecciones*, 111 D.P.R. 199 (1981); *Santos v. Comisión Estatal de Elecciones*, 111 D.P.R. 351 (1981)]". Informe de la Comisión de Gobierno del Senado de Puerto Rico sobre Enmiendas a la Ley Electoral de Puerto Rico (P. del S. 719) de 5 de diciembre de 1982. 36 (Núm. 14) Diario de Sesiones de la Asamblea Legislativa (Senado), 250 (1982).

C.E.R.P.E., en su informe de 17 de mayo de 1982, incorporó nuestra casuística y sus propuestas constituyeron el punto de partida para las enmiendas aprobadas mediante la Ley Núm. 3 de 10 de enero de 1983. Uno de los principales cambios —cuya interpretación es necesaria para la fiel y justa solución de la controversia que nos ocupa— *fue vigorizar la regla del consenso entre los partidos políticos y reducir y prescindir de la intervención del Presidente de la C.E.E. en ciertas decisiones.* Ejemplo de ello constituye el segundo párrafo adicionado al inciso (*l*) del Art. 1.005 de la Ley Electoral de Puerto Rico, *supra*, que dispone:

> A tales efectos la Comisión deberá adoptar el reglamento para las elecciones y el escrutinio general con por lo menos *cuatro (4) meses de anticipación.* Dicho reglamento incluirá, entre otras cosas, las estructuras y funcionamiento de los colegios electorales, las Juntas de Unidad Electoral, las comisiones locales y la Comisión Estatal de Elecciones, durante el período eleccionario y post-eleccionario, así como, el proceso de votación y escrutinio incluido, el del voto ausente y las disposiciones relativas al escrutinio general. Cualquier enmienda a dicho reglamento o a los procedimientos que allí se consignan, que se adopten dentro de los cuatro meses antes de las elecciones, serán adoptadas *por mayoría de votos en la Comisión.* Disponiéndose que cualquier enmienda durante el último mes antes de las elecciones o durante el día de las elecciones, y hasta que finalice el escrutinio, se hará por *unanimidad de votos en la Comisión.* Toda reglamentación que se adopte por la Comisión durante los últimos cuatro (4) meses

antes de las elecciones, podrá ser apelada directamente al Tribunal Supremo de Puerto Rico. (Énfasis suplido.)

Su lectura y análisis nos lleva a concluir que el legislador estableció una excepción a la regla general dispuesta en el inciso (e) del Art. 1.006, *supra* —según interpretada por este Foro en *P.S.P. v. Com. Estatal de Elecciones*, supra— en cuanto a la intervención y voto del Presidente de la C.E.E. en este renglón y período. Definitivamente, la regla general de no unanimidad entre los comisionados con la consabida votación y decisión en favor o en contra del Presidente de la C.E.E. a título institucional, fue alterada. La letra es clara y no admite otra interpretación. Como correctamente nos señala el apelante P.I.P. el vocablo "Comisión", con referencia a la participación y votación del Presidente de la C.E.E., "tiene varias acepciones distintas, y todas igualmente válidas dentro del marco de nuestro derecho [e]lectoral". Escrito de apelación del P.I.P., pág. 6. Así, cuando se trata de enmiendas al reglamento o a los procedimientos allí consignados durante el período de cuatro (4) meses con antelación al evento electoral, en los primeros tres (3) bastará una votación por *mayoría* de los comisionados para enmendarlo y, en el último, la *unanimidad*.

La enmienda no es accidentada ni irreflexiva. El legajo de la Asamblea Legislativa revela que ésta fue muy consciente de nuestras decisiones al enmendar la Ley Electoral de Puerto Rico. A ese momento se habían producido importantes pronunciamientos judiciales que habían afectado, en ciertas áreas sensibles, el esquema tradicional vigente. Aun así, habíamos refrendado la constitucionalidad de la mecánica de votación por unanimidad y el voto del Presidente de la C.E.E. Sobre la variante que nos ocupa —método de votación *especial* para enmiendas al reglamento para las elecciones y el escrutinio general, según dispuesto *in fine* en el Art. 1.005 de la Ley Electoral de Puerto Rico, *supra*, antes transcrito— el historial, aunque escaso, es particularmente

ilustrativo. Conocerlo nos permite detectar y precisar el propósito y espíritu inmerso en sus palabras.

Al respecto, el Informe de la Comisión de Gobierno del Senado antes aludido consignó:

8. *Las reglas de votación.*

La celebración de un evento electoral requiere la adopción de reglamentos en [los] que se regulen *los detalles no previstos* por el estatuto electoral. La aprobación de reglas *sin consenso entre los partidos* y aquellos que representan *cambios sustanciales* en la preparación y organización del proceso constituyen *peligros muy serios.*

Para *prevenir estos males* el estatuto propuesto requiere que cualquier enmienda a los reglamentos que se adopte dentro de los cuatro meses precedentes a la elección será aprobada por *mayoría de la Comisión,* y las que se hagan dentro del mes precedente a las elecciones, y hasta que finalice el escrutinio se harán por *unanimidad.* En estos casos las acciones para impugnar las disposiciones reglamentarias serán radicadas *en el Tribunal Supremo.* Véase Sección 3. (Énfasis suplido.) Informe de la Comisión de Gobierno del Senado, *supra,* págs. 265–266.

Es evidente que el legislador meticulosamente quiso reservar esta facultad al criterio compartido —*pero exclusivo*— de los partidos políticos y sus comisionados. En ese momento el trasfondo consistía precisamente de los tres (3) partidos políticos ante nos. Bajo la regla mayoritaria *absoluta,* no podía surgir un *empate.*(1) A ellos remitió esa pre-

---

(1) Reconocemos que es especulativo toda mención sobre un *empate* a base de existir números *pares* de partidos políticos. Únicamente lo hacemos compelidos por la interrogante que sobre el particular se plantea en la opinión mayoritaria. Basta señalar que tiende a debilitar la interpretación. Esa circunstancia no puede desnaturalizar la regla *especial* de consenso entre los partidos, *sin* intervención del Presidente de la Comisión Estatal de Elecciones (C.E.E.). Simplemente como organismo colegiado, de haber un *empate, no habrá enmienda mayoritaria* y subsistirá íntegramente el texto del reglamento aprobado con anterioridad a los cuatro (4) meses de las elecciones.

rrogativa, en consonancia con sus inquietudes de que la "aprobación de reglas *sin consenso entre los partidos* y aquellos que representan cambios sustanciales en la preparación y organización del proceso constituyen peligros *muy serios*". (Énfasis suplido.)

Esa preocupación, la *premisa de consenso partidista* y el evitar un desequilibrio en el balance partidista nos dan la clave para comprender la variante adicional en cuanto al método de votación de una enmienda reglamentaria durante el último mes que precede a una elección y hasta que finalice el escrutinio: "se hará por *unanimidad de votos en la Comisión*". Otra vez se excluye al Presidente de la C.E.E. de intervenir en tal decisión. En cualesquiera de los supuestos temporales, la norma opera contra una regla *absoluta* y no relativa, a distinción de la visualizada en el método de votación general en que el Presidente de la C.E.E. interviene según el Art. 1.006(e) de la Ley Electoral de Puerto Rico, *supra*. De prevalecer la contención del Presidente de la C.E.E. estaríamos concediendo al partido de la mayoría, P.P.D., el derecho potencial de ejercer dos (2) votos: uno de su Comisionado Electoral y otro a través de la persona de aquél, miembro afiliado a dicho partido por imperativo de la ley. Ello sería irreconciliable con la premisa cardinal de *con-*

---

Esa solución, por analogía, la aplicamos respecto a los *empates* en este Foro colegiado en asuntos que *no envuelvan decretos de inconstitucionalidad*. Ya se considere que no hay decisión o que teóricamente se une el voto del juez de instancia, el resultado es que se confirma la sentencia o dictamen. Ello equivale a decir que subsiste y se mantiene inalterada la decisión o decreto judicial. *P.I.P. v. E.L.A.*, 109 D.P.R. 685 (1980); *Rodríguez Sardenga v. Soto Rivera*, 108 D.P.R. 733 (1979); *Pueblo v. Báez Cartagena*, 108 D.P.R. 381 (1979); *Pueblo v. Delgado Rodríguez*, 108 D.P.R. 196 (1978).

La posibilidad conjetural de que un empate en el seno de la comisión sea superado con la intervención y el voto del Presidente de la C.E.E. —fundamentado en una regla de necesidad— destruiría toda la armonía y lógica de la excepción visualizada por la Asamblea Legislativa. De hecho, significaría realmente revivir la regla bajo el Art. 1.006(e), 16 L.P.R.A. sec. 3014(e), que el legislador *rechazó*.

*senso partidista* en esta área particularmente sensible según la intención del legislador.

En resumen, cuando se trata de enmiendas reglamentarias para las elecciones y escrutinio en los últimos cuatro (4) meses antes de las elecciones, la mecánica decisoria de la comisión sufre dos (2) alteraciones fundamentales: primero, se remite al consenso mayoritario o unánime *absoluto* de los comisionados y, segundo, se prescinde del Presidente de la C.E.E. en esa etapa o en la posterior. Huelga señalar que la *sabiduría* de este trámite no es materia de nuestra incumbencia. La misión judicial de este Foro no es juzgar su acierto, sino examinar si el medio elegido es compatible con nuestra Constitución y con la Ley Electoral de Puerto Rico. *McCormick v. Marrero, Juez*, 64 D.P.R. 260, 267 (1944). Si debe enmendarse, es asunto para la Asamblea Legislativa.

A la luz del diseño legislativo especial antes esbozado — regulatorio de cómo se produce una enmienda reglamentaria a las normas de votación y escrutinio dentro del período de cuatro (4) meses antes de una elección— resolvemos que el acuerdo mayoritario de los apelantes, los Comisionados Electorales del P.N.P. y del P.I.P., de 1ro de octubre es válido de su faz en lo concerniente al ámbito legal potestativo.

## III

De ordinario, esta conclusión sería suficiente para procesalmente revocar la resolución del Presidente de la C.E.E., licenciado Rodríguez Estrada, mediante la cual se negaba a acatarla. Sin embargo, como foro apelativo constitucional de última instancia, no podemos abstraernos de la delicada función revisora que directamente la Asamblea Legislativa impuso sobre nuestros hombros. F. Bayrón Toro, *En defensa de un sistema electoral jurídico e independiente*, 48 (Núm. 4) Rev. C. de Abo. P.R. 35, 50 (1987). La prerrogativa de los Comisionados Electorales de adoptar cualesquiera acuerdos fundamentados en la regla especial de mayoría o de unanimi-

dad absoluta, no es irrestricta. Tiene las limitaciones naturales "dimanantes de la Constitución, o de la Ley . . .". *P.S.P. v. Com. Estatal de Elecciones*, supra, pág. 412. Por esta razón, tampoco podemos ignorar los señalamientos del Comisionado Electoral del P.P.D., licenciado Báez Galib, en su comparecencia denominada "Escrito de Apelación", de que el acuerdo es ilegal por contravenir la Ley Electoral de Puerto Rico. Ineludible, pues, que nos veamos compelidos a examinar esa y otras contenciones, y las adjudiquemos en sus méritos.

Se imponen unas reflexiones mínimas. "El propósito de las elecciones es obtener la expresión de la voluntad de los votantes que constituyen el cuerpo electoral de un país." *La Nueva Constitución de Puerto Rico*, Río Piedras, Ed. U.P.R., 1954, pág. 307. En el pasado, al imprimirle contenido a las variadas dimensiones de este postulado, hemos señalado que "contra la observancia de los preceptos constitucionales no pueden oponerse *escollos salvables* de tipo económico o *burocráticos*. Es menester mover los resortes de la maquinaria electoral en la consecución de tal fin. *P.S.P.* v. *Tribunal Electoral*, 104 D.P.R. 230 (1975). En la constelación de derechos fundamentales, el sufragio electoral goza de preeminencia sobre inconvenientes administrativos o económicos superables". (Énfasis suplido y en el original.) *Ortiz Angleró v. Barreto Pérez*, 110 D.P.R. 84, 112–113 (1980).

Hoy nuevamente revitalizamos ese derecho. La premisa que nos anima es sencilla: no es permisible corrernos el riesgo de que se vulnere un solo voto, máxime si existe la posibilidad real de que a priori ocurra. Después de todo, ese elector —rico o pobre, instruido o no— es el protagonista central del conglomerado sociopolítico de toda elección. La salvaguarda de su ejercicio no puede justificarse por consideraciones teóricas, técnicas o administrativas, aunque sean de la mejor buena fe. Ese elector, al presente innominado, es acreedor a esa garantía y el Estado tiene la ineludible res-

ponsabilidad de hacerla viable una vez ha demostrado afirmativamente su disposición a ejercer su voto. Si de lo concreto vamos a lo abstracto, el potencial numérico alegado por los apelantes P.N.P. y P.I.P., de que son miles los electores excluidos erróneamente de las listas, simplemente abona a esta conclusión. En su verdadero sustrato, la justicia o injusticia del sistema preelectoral no se mide exclusivamente en términos cuantitativos. Es después de emitidos que se cuentan los votos. Ello no es posible si se clausuran las urnas indebidamente y a destiempo.

Concentrémonos, pues, en la juridicidad de la enmienda aprobada. En síntesis, persigue que los *electores cualificados* que el día de las elecciones generales de 8 de noviembre de 1988 reclamen su derecho al voto *y no aparezcan en las listas electorales*, puedan hacerlo mediante la anotación de su nombre en las listas electorales correspondientes por los funcionarios de los partidos políticos en los colegios de votación. Según adoptado por la mayoría, el procedimiento es el siguiente:

1. El día de las elecciones, el elector hace su reclamación de que ha sido exclu[i]do de las listas por error y *presenta su tarjeta de identificación* electoral perforada en 1984 ante la Junta de Unidad Electoral.

2. Luego de verificarse que efectivamente no aparece en lista, *se le entrega un boleto o autorización* con el nombre del elector y con todas sus circunstancias personales y electorales para que vote en un colegio asignado para estos casos (el último colegio del centro de votación).

3. En el colegio, *se verifica* con la *lámpara especial que el elector no haya sido entintado previamente en otro colegio de votación* y el elector entrega el boleto a los inspectores de Partidos para que se incluya en los materiales relacionados con estos casos.

4. Se le *perfora la tarjeta de identificación* y se le *retiene* en el colegio para ser inclu[i]da en los materiales referentes a estos casos y no pueda volver a ser utilizada por el elector durante el día de votación.

5. El elector *firma una declaración jurada* con todas las *advertencias* de *penalidades* de ley en la cual el elector jura que:

a) es un elector con derecho a votar.

b) .que su nombre ha sido exclu[i]do de las listas por error atribu[i]ble al organismo electoral.

c) que el elector no ha votado con anterioridad a dicho momento ni en voto adelantado, voto ausente ni en ningún colegio electoral en Puerto Rico ni que así [ha]brá de hacerlo con posterioridad a dicho momento para los cargos electivos del 8 de noviembre de 1988.

6. Luego se le entrega[n] al elector las papeletas de votación para que emit[a] su voto y se añade el nombre y todas las circunstancias personales y electorales del elector en una lista especial para estos casos la cual tiene que firmar el elector.

7. Al final se le entrega[n] al elector las papeletas de votación, y luego que vota, *se recusa dicha papeleta por estar su derecho pendiente de adjudicación* y se depositan las papeletas en un sobre especial previamente impreso donde vaciará toda la información pertinente al elector y se incluirá[n] todos los materiales relacionados con el caso, tales como la declaración jurada, el Boleto de autorización, etc.

8. Dicho Sobre Sellado [con] la papeleta del elector se depositará en la urna y al momento del escrutinio este voto se tendrá *por no adjudicado* hasta que se verifique e investigue en la Junta de Unidad, en la Junta de Inscripción Permanente ese mismo día o en el escrutinio general de la Comisión Estatal de Elecciones, *el derecho del elector a votar.* (Énfasis suplido.) Escrito de apelación del P.I.P., págs. 2–3.

En contra de este acuerdo se aduce que la enmienda infringe la Ley Electoral de Puerto Rico y abrirá una brecha peligrosa para que fraudulentamente voten electores no cualificados. La transcripción de la reunión especial en que se acordó refleja que las posiciones del Comisionado Electoral del P.P.D. —y algunas de las posteriormente asumidas por el Presidente de la C.E.E., reiteradas en sus respectivas comparecencias— se fundaron básicamente en las premisas siguientes: que la C.E.E. ha realizado una masiva campaña pública para invitar a los electores a inscribirse y verificar su

*status* electoral; que ello genera una obligación en los electores de averiguar su estado electoral en las listas; que se establecieron centros de información al respecto y se suplieron a todos los partidos políticos las listas y las cintas correspondientes; que el 6 de octubre, por unanimidad, la C.E.E. aprobó un procedimiento especial que permite a los electores que no aparezcan inscritos en las listas, hasta el 4 de noviembre, subsanar esa omisión; que la experiencia en las elecciones pasadas reflejó que sólo un número pequeño de electores quedaron excluidos; que algunas personas han obtenido sin derecho la tarjeta de identificación electoral; que los electores excluidos de las listas correspondientes al 30 de octubre y 4 de noviembre no van a estar incluidos en la lista del colegio de 8 de noviembre, y que todos los electores tuvieron la oportunidad de cotejar su inclusión, lo que de no hacerse implica una renuncia al derecho a votar.

A favor de la enmienda, los Comisionados Electorales del P.N.P. y P.I.P. adujeron el valor trascendental del sufragio; que la enmienda esencialmente sigue el trámite autorizado por la C.E.E. para las elecciones generales de 1980 y 1984, y las recientes primarias presidenciales, ello con la anuencia del entonces y actual representante del P.P.D. Sobre todo que siempre, por errores humanos u otras razones, quedan excluidos de las listas electores legalmente inscritos. En su abono unieron a sus apelaciones varios documentos que revelan múltiples instancias —tan recientes como al 13 de septiembre de 1988— de electores cuyas transacciones de reubicación no habían sido procesadas. Además, como hecho no contradicho, la circunstancia de que en relación con la entrada de nuevas inscripciones al Registro Electoral la capacidad del computador *Digital* de la C.E.E. —que procesa las peticiones de inscripción y produce las listas electorales— estaba limitada a 3,276,750 casos. *Al 28 de septiembre de 1988 estaban recibiéndose unas 2,000 peticiones de inscripción en exceso de dicha capacidad.*

Estos documentos demuestran que, en mayor o menor grado, más que una posibilidad es una *realidad* que electores cualificados se han quedado por error fuera de las listas. Tan es así que, por unanimidad, el pasado 6 de octubre la propia C.E.E. redujo a escrito y aprobó un trámite que había acordado desde el 27 de septiembre, con miras a actualizar lo más posible —pero limitado hasta el 4 de noviembre— las listas electores. *Exhibit* I del P.N.P. Ese acuerdo, si algún significado tiene, es que constituye un reconocimiento expreso de todos los Comisionados Electorales de la falla básica que motivó la enmienda mayoritaria. El Comisionado Electoral del P.P.D., licenciado Báez Galib, admite en su escrito que *no existe un registro perfecto*, pues "[independientemente] de lo automatizado de un sistema, la información inicial es generada por humanos, con sus limitaciones y propensi[ones]". Escrito de apelación del P.P.D., pág. 15.

En resumen, de no autorizarse su inclusión mediante el trámite de salvaguarda acordado por la mayoría, la C.E.E. no podrá cumplir cabalmente con el mandato primario legislativo "de *garantizar* el libre ejercicio de la franquicia electoral . . .". Art. 2.001 de la Ley Electoral de Puerto Rico, 16 L.P.R.A. sec. 3051. Al cerrárseles las puertas, incuestionablemente esos ciudadanos sufrirán un daño *irreparable*. Ese perjuicio no es susceptible de ser remediado mediante excusas posteriores atribuibles a las faltas humanas o técnicas de la maquinaria electoral. La situación no es nueva. En *P.S.P. v. Com. Estatal de Elecciones*, supra, págs. 423–424, aludimos cómo, "para salvar las exclusiones incorrectas de electores, la Comisión creó Colegios Especiales denominados 'F-1' en cada precinto electoral permitiendo *que éstos votaran, aunque no aparecieran en las listas. Se superó así la falla técnica*, aceptándose la presentación de la tarjeta de identificación electoral o copia de una petición de inscripción como indicativo de la idoneidad del elector. Acordó también convalidar la primera inscripción en casos de doble inscrip-

ción motivada por el sistema y autorizar la adjudicación de las papeletas electorales que demostraban haberse efectuado oportunamente la transferencia, pero que la Comisión no la procesó o lo hizo erróneamente". (Énfasis suplido.) Otra vez nos toca remediarla.

## IV

La legalidad, razonabilidad y necesidad de la enmienda reglamentaria adoptada queda demostrada al confrontar ciertos principios elementales vislumbrados en la Ley Electoral de Puerto Rico con referencia al derecho al voto y su ejercicio. Veamos.

*Primero*. Por definición, un elector cualificado sencillamente es una persona que *ha cumplido con los requisitos de inscripción* y de *tarjeta electoral.* Art. 1.003(17) de la Ley Electoral de Puerto Rico, 16 L.P.R.A. sec. 3003(17). *La ley no le exige más.* Una vez formula a tiempo su petición de inscripción, de reubicación o de transferencia, corresponde a la C.E.E., mediante su aparato burocrático, darle cabida y acreditar esa condición. Desde el momento en que dicho ciudadano cumple con los trámites previos y demás requisitos de ley, es un elector capacitado para acudir a las urnas y depositar su voto. Su omisión en el Registro Electoral o en la lista, producida por errores humanos, técnicos o atribuibles a las limitaciones de acceso o incapacidad de actualización del sistema operado por la C.E.E., no es motivo válido para negarle ese derecho.

*Segundo*. Estamos ante un derecho *fundamental*, el cual nuestra Constitución ordena expresamente garantizar su ejercicio. Art. II, Sec. 2, Const. E.L.A., L.P.R.A., Tomo 1. Es claro, pues, que la omisión en la lista electoral *no puede constitucionalmente ser fundamento para dicha negativa.* Las listas electorales debidamente depuradas son meramente un instrumento fehaciente más —útil y principal— para canalizar y hacer viable administrativamente el desarrollo del

complicado proceso eleccionario en todo el país. Por imperativo de la magnitud y complejidades del evento, son imprescindibles.

Así entendido, carece de fuerza persuasiva la posición del Presidente de la C.E.E. de que la Ley Electoral de Puerto Rico no dispone la inclusión manual de electores que no aparezcan en las listas. Asumió esa postura a base del lenguaje del Art. 5.026 de la Ley Electoral de Puerto Rico, 16 L.P.R.A. sec. 3229, preceptivo de que antes de emitir el elector su voto *se localizará en la lista del colegio su nombre* y, en tres (3) minutos, se confrontarán los datos con la tarjeta electoral. De ahí infiere que si el elector no está en la lista no puede votar.

La interpretación es irrazonablemente incompleta. Eleva a categoría sacramental un *medio* documental. Convierte las listas en *sinónimo* de inscripción y cualificación electoral. El enfoque es erróneo. No hay equivalencia conceptual ni valorativa en qué sostener ese restrictivo razonamiento. Pasa por alto la verdadera disposición aplicable, a saber, el Art. 5.003 de la Ley Electoral de Puerto Rico que, sin ambajes, prescribe que "[t]endrán derecho a votar en la elección general *los electores debidamente calificados* como tal[es], que a la fecha de la elección figuren en el Registro General de Electores". (Énfasis suplido.) 16 L.P.R.A. sec. 3203. *Ello impone el deber a la C.E.E. de mantener un registro al día y completo.*

*Tercero.* La Asamblea Legislativa —conocedora de esta situación y práctica— nunca la ha prohibido expresamente. Ni en el pasado ni al presente —por razones constitucionales obvias— ha autorizado *descualificación* al sufragio por errores u omisiones en el Registro Electoral, en las listas electorales u otros asientos análogos.

No existe en la Ley Electoral de Puerto Rico disposición alguna de la cual directa o indirectamente pueda avalarse la interpretación negativa del Presidente de la C.E.E. Por el

contrario, al disponer el legislador que "[t]odas las listas de electores *con derecho a votar* en una elección se prepararán tomando como base tal Registro [Electoral]" —(énfasis suplido) Art. 2.012 de la Ley Electoral de Puerto Rico, 16 L.P.R.A. sec. 3062— partió del supuesto, allí previsto, de que toda la información sería procesada a tiempo y correctamente, esto es, que sus datos "se mantendr[ía]n, *en todo momento*, actualizados en cuanto a circunstancias modificatorias de cualquier inscripción". (Énfasis suplido.) Íd. No podemos, pues, atribuirle a la Asamblea Legislativa tal *brutum fulmen*, en particular en un área en que aspiraba al perfeccionamiento y mejoramiento institucional y, sin vacilaciones, rechazó toda tentativa erigida en el conformismo o en la mediocridad.

Repetimos, las listas electorales simplemente son un instrumento documental necesario, para que el Estado canalice ordenadamente todo el proceso comicial. Pero en sí, no son un fin; menos, razón para excluir —pocos o muchos— electores cualificados que diligentemente cumplieron con la obligación de inscribirse o de solicitar un cambio.

*Cuarto.* El único mandato que claramente estableció la Asamblea Legislativa fue garantizar el derecho al voto. Así, en el Art. 2.006 de la Ley Electoral de Puerto Rico, 16 L.P.R.A. sec. 3056, prohibió terminantemente, "mediante regla, reglamento, orden, *resolución, interpretación* o *en cualquier otra forma*, rechazar, cancelar, invalidar o anular *el registro o inscripción legal de un elector o privar a uno debidamente calificado de su derecho al voto*". (Énfasis suplido.)

*Quinto.* No puede sostenerse la negativa a la enmienda en la campaña publicitaria que encomiablemente ha efectuado la C.E.E., en el argumento de que ello genera un deber de los electores de asegurarse que estén incluidos en las listas electorales. El planteamiento lo formula el Comisionado Electoral del P.P.D., quien lo caracteriza *"como contro-*

*versia real y básica de este asunto*: si existe una obligación del elector de asegurarse que su estado electoral est[é] correcto, o si es obligación del [E]stado atender todas las necesidades de ese elector desde inscribirlo, llevarlo a votar, llevarlo de votar, asegurar su estado electoral, informarle de éste y de d[ó]nde habrá de votar". (Énfasis suplido.) Escrito de apelación del P.P.D., pág. 10. A su juicio, "[e]l concepto de estar inclu[i]do en la lista implica asegurarse el ciudadano, que sí está. La obligación del [E]stado es mantener el sistema, avisar y notificar, proveer todos los mecanismos de inclusión e información y los de corrección de errores. Conocido por el elector que debe cotejarse y de cuándo son las fechas límites para corregir asientos[,] el no hacerlo implica una renuncia a un derecho renunciable. Implica que acepta [que] no esté su nombre en las listas electorales". Íd. Más adelante concluye afirmativamente "que existe una obligación del elector [de] asegurar su estado electoral previo al día de elecciones". Íd., pág. 11.

El señalamiento no es novel. En *P.P.D. v. Admor. Gen. de Elecciones*, 111 D.P.R. 199 (1981), fue planteado. En aquella ocasión, el Administrador General de Elecciones y el candidato del P.N.P. certificado, Osvaldo Molina, nos sostenían:

> Los electores son adultos. Tienen, además, organismos que cooperan gratuitamente en ayudarle al trámite administrativo. Entre estos se encuentran la propia Comisión, la Junta Revisora, los Partidos y agrupaciones políticas, los medios noticiosos, etc. . . . Pero el elector no puede tener unas expectativas utópicas de la realidad. *Se espera de él un esfuerzo razonable en cotejar si su inscripción tiene problemas y si su petición está correcta. También se espera que sea diligente y coteje en fecha cercana a las Elecciones si la petición de transferencia que llenó fue procesada y si no, por qué razones.* A tales efectos y para remediar casos con problemas, la Comisión[,] en ánimo también liberal, estableció Centros de Información Electoral con terminales de computadoras en forma permanente y que operaron el mes antes de las elec-

ciones de 8:00 A.M. a 12 de la noche. La Junta Revisora Electoral, la Comisión Estatal de Elecciones y las Comisiones Locales se constituyeron en sesión permanente y se diseñó e implementó el Procedimiento de Inclusión de Electores que antes hemos mencionado. *Se le dio amplia publicidad por los medios noticiosos y se les exhortó encarecidamente a que todos los electores se cotejaran en las listas.* (Énfasis suplido.) Caso Núm. O-81-27, Alegato de los recurridos, pág. 68.

Y más adelante:

El elector tiene derechos, *pero también tiene deberes.* Precisamente el Artículo 2.002 de la Ley Electoral está concebido en término[s] del *deber del elector. Para cumplir con su deber tiene que ser diligente.* El Estado le proporciona los medios pero no puede pretender para con él un trato privilegiado y fuera de la realidad de nuestra sociedad de masas. (Énfasis suplido.) Caso Núm. O-81-27, *supra*, pág. 71.

Por su parte, el P.P.D. y el candidato Samuel Cepeda nos ofrecieron los siguientes argumentos en contra:

El Estado puede, sin lugar a dudas, establecer como requisito que el elector haga la gestión de inscribirse en el Registro Electoral, caso de *Ortiz Angleró v. Barreto [Pérez]*, 110 D.P.R. 84 (1980), o en el caso de electores ya previamente inscritos que hagan una transferencia para ejercer su derecho al voto en la comunidad a la que ahora pertenecen. *La consecuencia natural de esta gestión debe ser la presencia del elector en la lista de votación.* Cuando el elector no aparece por causas atribuibles a él —como el inscribirse dentro de un plazo razonable, véase *Dunn v. Blumstein*, 405 U.S. 330 (1972); *Ort[i]z Angleró v. Barreto [Pérez]* supra; *Marston v. Lewis*, 410 U.S. 489 (1972); *Burns [v.] Fors[ton]*, 410 U.S. 686 (1972); su exclusión del proceso electoral es constitucionalmente válida por cuanto la presencia en la lista electoral es un medio necesario para adelantar el interés apremiante en prevenir un fraude. *Cuando la ausencia del nombre en las listas no es atribu[i]ble al elector —como cuando la computadora desaparece el nombre o cuando los funcionarios de la C.E.E. no tienen tiempo para verificar el precinto de procedencia de un elector que desea la transferencia—* el interés de preven-

ción por parte del Estado pierde su carácter apremiante frente al derecho al voto. (Énfasis suplido.) Caso Núm. O-81-27, Alegato de los recurrentes, pág. 30.

Y subsiguientemente:

Desde el punto de vista sustantivo, no cabe duda de que el Estado puede requerir del elector la realización de una gestión afirmativa para poder ejercer su derecho al voto. Los requisitos procesales no pueden ser de tal forma onerosos que anulen el ejercicio de la franquicia electoral. [*Cf.*] *Williams v. Rhodes,* 393 U.S. 23 (1968); *Harper v. Virginia State Board of Elections,* 383 U.S. 663 (1966). La teoría de la Junta Revisora Electoral caería bajo esta descripción. Veamos.

Bajo la teoría de la Junta Revisora Electoral un elector debe saber su número electoral y el de todos los precintos en que haya vivido. Debe conocer, además, las diferencias entre una solicitud de inscripción y de transferencia y advertir los errores que pueda cometer el escribiente al escoger el formulario. *Debe también estar cont[i]nuamente pendiente a que las computadoras de la C.E.E. tengan a bien procesar su solicitud.* Bajo las teorías de la J.R.E. es el elector —nunca el Estado— el que tiene que velar po[r q]ue su interés en asegurar su derecho al voto se materialice en un asiento electoral en el precinto de su residencia.

También bajo esta teoría el desconocimiento de tales responsabilidades no tiene consecuencia cuando los funcionarios que llenan la solicitud del elector son más aptos o cuando éste tiene la fortuna de que su partido político, empeñado en labor detectivesca, percibe el error o cuando la C.E.E. tiene algún tiempo disponible para procesar la petición y suplir cualquier error u omisión.

*Esto es sencillamente insostenible.* Una Ley Electoral que imponga sobre el elector todas esas obligaciones, que lo sancione por imperfecciones técnicas y que haga depender el derecho al voto de circunstancias fortuitas, *no cumple con el mandato constitucional* de que las leyes garantizarán la libre expresión de la voluntad del pueblo mediante el ejercicio del sufragio universal, igual, directo y secreto. *Constitución del Estado Libre Asociado de Puerto Rico,* Artículo II, Sección 2. Tal esquema violenta el ideal de prevalecencia de los derechos

electorales del ciudadano sobre los derechos y prerrogativas de todos los partidos y agrupaciones políticas. Ley Electoral, Artículo 2.001(11). *Hace mucho tiempo que nuestro sistema jurídico se liberó del dominio de formas sacramentales que ahogaban la justicia. Con más razón y fuerza debe rechazarse la imposición de tecnicismos que tienen el efecto de anular la voluntad de un elector que depende de los organismos oficiales para que le ayuden a materializar su deseo de votar en el lugar en que vive y cuyo derecho al voto no puede estar sometido a los riesgos que representan las operaciones computarizadas, los formularios oficiales y la negligencia de los funcionarios.* La primacía del derecho al sufragio es de tal forma trascendental, véase *Wesbery v. Sanders*, 376 US 1; *Reynolds v. Sims*, 377 US 55, que ni tan siquiera errores de los electores que no tengan su base en intenciones fraudulentas deben dar lugar a la anulación de un voto. (Énfasis suplido y en el original; escolio omitido.) Caso Núm. O-81-27, Alegato de los recurrentes, págs. 32–33.

Salvo su elaboración, los argumentos *son idénticos*, aunque desde otra perspectiva situacional. Al entonces evaluarlos, rechazamos la tesis de "curiosidad de [un elector] averiguar su [status] electoral". *P.P.D. v. Admor. Gen. de Elecciones*, supra, pág. 244. Sin ambigüedades resolvimos a favor del P.P.D. que "[t]al proposición es inaceptable, pues colocaría siempre sobre el elector, y nunca sobre el Estado, la obligación de supervisar el trámite administrativo de la Comisión Estatal de Elecciones". Íd.

Aunque la Ley Electoral de Puerto Rico fue enmendada, en lo pertinente, subsisten básicamente disposiciones análogas que validan esa interpretación. No existen, pues, razones de peso para modificar ese pronunciamiento. La Constitución es la misma. Sólo han cambiado los protagonistas y sus posiciones partidistas.

Finalmente, el mecanismo propuesto en la enmienda contiene amplias y suficientes salvaguardas. Representa un balance entre el derecho al sufragio y el interés de que sólo se adjudiquen los votos de electores cualificados. El entintado y

su verificación con la lámpara especial ultravioleta excluye el riesgo de la doble votación. La presentación, perforación y retención de la tarjeta electoral, la declaración jurada exigida, su recusación y adjudicación posterior —una vez verificadas las cualidades del elector— salvan cualquier peligro de fraude.

## V

A modo de epílogo, es menester reiterar que el "derecho al sufragio, espina dorsal del cuerpo de la democracia, opera y se fortalece de aires y corrientes liberales". *P.S.P. v. Com. Estatal de Elecciones*, supra, pág. 423. Cada elección general representa un reto a la democracia puertorriqueña. Corresponde al Estado —a través de la C.E.E. y coadyuvado por los partidos políticos, funcionarios y demás ciudadanos— lograr que los comicios sean justos, pacíficos, ordenados, libres de fraude y honestos.

Reconocemos que muchas de las deficiencias tradicionales han sido superadas mediante el esfuerzo combinado de todos los principales integrantes actuales de la C.E.E., los partidos y sus colaboradores. Sin embargo, algunas subsisten, en particular aquellas que aun reducidas a un mínimo no pueden ser totalmente eliminadas por formar parte inherente de la fragilidad humana y ser inseparables de un sistema, no importa cuán moderno sea. Ciertamente, el dar a conocer prontamente los resultados eleccionarios,[2] evitar controversias e impugnaciones y dar certeza y finalidad son

---

[2] El mandato a la C.E.E. de ofrecer resultados parciales antes del mediodía del día siguiente, e informar los preliminares antes de setenta y dos (72) horas, no queda desnaturalizado por la enmienda. Según resolvimos en *P.P.D. v. Barreto Pérez*, 110 D.P.R. 376, 383 (1980), aunque teóricamente "es concebible que dicho resultado preliminar puede reflejar, al momento que se emite, las consecuencias finales de la elección[, p]or su naturaleza limitada y parcial, sin embargo, no pueden atribuírsele efectos más allá de su ámbito". Precisamente, esto último sería una de las consecuencias de prevalecer la posición del P.P.D.

objetivos legítimos. Pero los mismos no pueden ser a costa de un precio tan alto como es el derecho al sufragio por deficiencias en el sistema.

Por los fundamentos expuestos, es válido el acuerdo mayoritario de 1ro de octubre de 1988, enmendatorio del reglamento de votación y escrutinio. El Presidente de la C.E.E., licenciado Rodríguez Estrada, deberá acatarlo inmediatamente.

—O—

Opinión concurrente y disidente del Juez Asociado Señor Ortiz.

I

Estoy conforme con la decisión del Tribunal en tanto y en cuanto pone en vigor la enmienda propuesta por los Comisionados Electorales de los Partidos Nuevo Progresista e Independentista Puertorriqueño. El sistema propuesto hace viable en una forma eficaz el sufragio de aquellos electores que han sido excluidos de las listas electorales de su precinto por causas atribuibles al organismo electoral. A estas personas, sean muchas o pocas, se les debe ofrecer máximas garantías para que puedan ejercer su sagrado derecho al voto. La enmienda establece una forma adicional de poner en vigor el mandato legislativo estatuido, entre otros, en el Art. 2.006 de la Ley Electoral de Puerto Rico, 16 L.P.R.A. sec. 3056.(1) El sistema adoptado no creará mayores dificultades a la Comisión Estatal de Elecciones (C.E.E.), ya que sólo se beneficia un grupo limitado de electores. Los que han sido excluidos

---

(1) Dispone, en lo pertinente, lo siguiente:

"A no ser en virtud de lo dispuesto en este Subtítulo o de una orden emitida por un Tribunal de Justicia con competencia para ello, no se podrá, mediante regla, reglamento, orden, resolución, interpretación o en cualquier otra forma, rechazar, cancelar, invalidar o anular el registro o inscripción legal de un elector o privar a uno debidamente calificado de su derecho al voto." 16 L.P.R.A. sec. 3056.

de las listas electorales por las causas y el procedimiento
establecido para ello, Art. 2.023 de la Ley Electoral de
Puerto Rico, 16 L.P.R.A. sec. 3073,(²) no pueden acogerse a

(²) Dispone que:

"Para que se proceda a la eliminación de un elector que aparezca en la lista
de peticiones de inscripción, deberá presentarse ante el Presidente de la Comi-
sión Local de Elecciones una solicitud de exclusión de dicho elector, por uno o
más de los siguientes fundamentos:

"(a) Que el elector no es ciudadano de los Estados Unidos de América.

"(b) Que el elector no está domiciliado en la dirección señalada en su peti-
ción a la fecha de inscripción, ni en el momento de la recusación.

"(c) Que el elector no ha cumplido 18 años y no habrá de cumplirlos en o
antes del día de las siguientes elecciones generales.

"(d) Que el elector haya fallecido o que no es la persona que alega ser en su
petición de inscripción.

"(e) Que el elector ha sido declarado incapacitado judicialmente.

"(f) Que el elector aparece inscrito más de una vez en las listas electorales.

"Toda solicitud de exclusión de un elector deberá contener la siguiente infor-
mación:

"(a) Nombre y apellidos del elector cuya exclusión se solicita.

"(b) Edad con que aparece en la petición de inscripción.

"(c) Dirección del elector, según aparece consignada en la petición de ins-
cripción.

"(d) Motivos en que se funda la recusación.

"Dicha recusación se radicará debidamente juramentada ante el Presidente
de la Comisión Local del precinto a que corresponda la petición. El juramento
requerido podrá ser prestado ante cualquier miembro de la Comisión Local, nota-
rio público, Secretario del Tribunal o funcionario autorizado por ley para tomar
juramentos en Puerto Rico.

"Una vez el Presidente reciba la recusación debidamente cumplimentada
señalará vista dentro de los diez (10) días siguientes para oír la prueba que co-
rresponda, debiéndose citar al elector recusado, al recusador y a cualquier otra
persona que las partes solicitaren sea citada. Se notificará, asimismo, a los Comi-
sionados Locales de los distintos partidos políticos. La Comisión Estatal, previa
solicitud y justificación al efecto, tendrá facultad para extender el término de la
celebración de vistas.

"La validez o procedencia de una recusación será decidida por acuerdo uná-
nime de los miembros de la Comisión Local. Cuando no hubiere tal unanimidad la
recusación será decidida, a favor o en contra, por el Presidente, siendo ésta la
única ocasión o circunstancia en que dicho Presidente podrá entender en una
recusación.

"Una vez se decida que procede la recusación, el Presidente ordenará la
eliminación del elector en la lista de inscripción o del Registro General de Elec-
tores, según sea el caso, excepto cuando la recusación se base en lo dispuesto por
el inciso (f) de esta sección, en cuyo caso se eliminará la inscripción o inscrip-
ciones que determine la Comisión por reglamento.

dicho procedimiento para revisar las determinaciones finales.

Por dichas razones revocaría el acuerdo de la C.E.E. mediante la cual se negó a aprobar la enmienda propuesta.

## II

No puedo suscribir la totalidad del dictamen del Tribunal. Discrepo de la posición asumida por la mayoría de negarle al Presidente de la C.E.E. el derecho a votar en las enmiendas que se propongan al Reglamento General de Elecciones.

Entiendo que el texto del artículo es claro. Contrario al procedimiento general que sólo le da, en primera instancia, derecho a votar a los comisionados, el Art. 1.005 de la Ley Electoral de Puerto Rico, 16 L.P.R.A. sec. 3013(*l*), establece que los acuerdos se tomarán por unanimidad o por mayoría de votos en la C.E.E. El Presidente es miembro de la C.E.E. con derecho al voto. Si la Legislatura hubiera querido que sólo los comisionados pudieran votar, lo debieron haber hecho expresamente tal como lo hicieron en el Art. 1.006 (16 L.P.R.A. sec. 3014).

Aparte de la correcta interpretación del estatuto, me preocupa el resultado y sus fundamentos. Al resolver este caso estamos amputando, de manera significativa, los poderes y facultades de un cargo de gran importancia. Se ha conver-

---

"El Presidente especificará en la orden de exclusión o no aceptación de la petición de inscripción o solicitud de transferencia si la decisión fue tomada por la Comisión Local, unánimemente, o por determinación a favor o en contra del Presidente y la razón de la exclusión o no aceptación de la petición o solicitud. También deberá notificar de su acción a la Comisión Estatal, Comisionados Locales de los partidos políticos, Comisionados Electorales Estatales, al recusador y al recusado.

"La ausencia del elector recusado de la vista no releva al recusador de presentar pruebas.

"Tanto el recusado como el recusador podrán apelar la determinaci[ó]n de la Comisión Local o su Presidente ante la Comisión Estatal dentro de los cinco (5) días siguientes, excepto lo dispuesto para las recusaciones por domicilio electoral." 16 L.P.R.A. sec. 3073.

tido al Presidente de la C.E.E. en un mero administrador del sistema sin ninguna injerencia en las decisiones básicas del organismo cuando éste ejerce funciones legislativas o cuasi judiciales. Si añadimos a esto que la decisión legislativa avalada por este Tribunal está predicada en la presunción de que el Presidente de la C.E.E. siempre actuará conforme a su afiliación política, más preocupante resulta ser la decisión adoptada hoy.